(814 P.2d 961)

No. 64,277 ■

RICHARD REYNA, *Appellant*, v. GENERAL GROUP OF COMPANIES, KANSAS, INC., *et al.*, *Appellees*.

592

Opinion filed Febuary 15, 1991.

*Jack Shelton*, of Wichita, for appellant.

*Patrick C. Blanchard*, of Young, Bogle, McCausland, Wells & Clark, P.A., of Wichita, for appellees.

Before DAVIS, P.J., LEWIS and PIERRON, JJ.

PIERRON, J.: Richard Reyna (plaintiff-appellant) appeals from the trial court's post-trial judgment finding his lawsuit was frivolous and imposing sanctions pursuant to K.S.A. 1990 Supp. 60-211 and K.S.A. 60-2007.

On September 2, 1988, Reyna, with the assistance of his attorney, Jack Shelton, filed a petition in district court asserting a breach of employment contract claim against the corporate defendant, General Group of Companies, Kansas, Inc., (General) and claims against the individual defendants, Bogle and McDavitt, for fraudulent misrepresentation. Reyna asserted a fraudulent inducement claim against Bogle and McDavitt, the owners of General, stating that they induced him to leave his $3,000 per month job by fraudulently promising to assign him General's exclusive Kansas City territory, where General's previous subagent earned more than $10,000 per month. He also asserted a contract claim against General for back wages and damages resulting from General's alleged breach of their subsequent agreement to assign Reyna two other exclusive territories, and General's promise to pay him in excess of $2,000 per month.

General is a general agent for the General Warranty Company of California (GWOC) and employs a network of subagents to market vehicle service contracts to automobile dealers. The automobile dealers, in turn, market the vehicle service contracts to their consumers. Purchase of a service contract by an automobile consumer, in effect, extends either the dealer's warranty or the manufacturer's warranty on the vehicle, depending on whether

the service contract is an OEM (original equipment manufacturer) or non-OEM agreement.

OEM contracts are issued by GWOC but carry the original equipment manufacturer's name (*e.g.*, Saab) and result from dealings directly between GWOC and the automobile manufacturer. These contracts provide general agents a guaranteed income for servicing the account. Non-OEM service contracts provide the general agents a higher commission than OEM contracts but do not provide a guaranteed income for servicing the accounts. OEM accounts are apparently assigned by GWOC on a franchise-type basis, which gives a general agent an exclusive right to market OEM service contracts to automobile dealers in a particular area.

The defendants' answer denied each of Reyna's material allegations, and the suit proceeded to a jury trial on May 2, 1989. During the trial, the defendants moved for a directed verdict after Reyna introduced all of his evidence except the evidence in support of his claim for punitive damages for fraud. The defendants argued that no credible evidence existed to support Reyna's fraudulent promises claim regarding exclusive rights to sell vehicle service contracts in Texas or Oklahoma or to support the fraudulent inducement claim. They also argued that the contract issue was ripe for determination by a directed verdict and, even if it was not, there was a complete failure of evidence of Reyna's claim for wages lost as a result of the breach because, contrary to Reyna's petition, his tax returns showed that he was employed for at least eight of the nine months remaining in 1987 after the defendants terminated him. Reyna argued that there was at least conflicting evidence on each of these issues and that the trial judge, required to view the evidence in the light most favorable to Reyna, should deny the defendants' motion. The trial court agreed with the defendants on wage expectancy and granted a directed verdict on that issue, but denied the motion in all other respects.

In doing so, the trial judge noted that the plaintiff's case was weak, commenting that it was "not the most powerful fraud case that ever came along," and there were "real problems" on the fraudulent inducement claim because the evidence established that Reyna had left his prior employment before beginning his job with General. The judge also noted there was a "real ques-

tion" in his mind on Reyna's claim that the defendants fraudulently promised to assign him the Texas territory, but indicated he would "bend that far" for the plaintiff even though Reyna indicated an understanding that the defendants did not have exclusive rights to sell in Texas. The judge's rationale for allowing this issue to proceed was based upon Reyna's testimony that the defendants promised him everything would be fine.

The defendants renewed their motion for directed verdict at the close of all the evidence, but the trial judge denied this motion as well.

After the four-day trial, the jury found the defendants did not breach the employment contract nor commit any fraud against Reyna.

On June 9, 1989, the defendants filed a motion for sanctions against Reyna and his attorney, alleging that attorney Shelton failed to send a demand letter to the defendants; that Shelton failed to conduct a reasonable inquiry into the factual basis of Reyna's claims both prior to, and subsequent to, the filing of the petition; and that the lawsuit had no adequate basis in fact.

The trial court conducted a hearing on the motion on July 31, 1989, and concluded the defendants' allegations were correct. Accordingly, the trial court imposed sanctions against Reyna and Shelton, jointly and severally, consisting of the total amount of the attorney fees incurred by the defendants, $7,024.

Reyna timely appeals.

The two key issues in this appeal are whether the trial court erred in imposing sanctions and whether the trial court's findings were adequate to establish that Reyna and Shelton exercised bad faith.

Concerning whether the trial court erred in imposing sanctions, Reyna contends the trial court erred because it had previously denied two defense motions for directed verdict, allowed his punitive damage claim to go to the jury, and instructed the jury on all of the plaintiff's major claims. He argues that these preverdict rulings were grounded on the legal premise that he had introduced substantial evidence to support his claims; the nature of the evidence was such that reasonable minds could differ as to the facts; and it was inconsistent for the trial court to impose sanctions after finding the evidence was sufficient to allow the

case to go to the jury. He also argues that the trial judge's remarks to the parties at the close of the case stating the attorneys did a "good job" are inconsistent with the later imposition of sanctions. The defendants contend no error occurred because the facts clearly established that Shelton failed to investigate Reyna's allegations before filing the lawsuit. The defendants also contend that the denying of motions for directed verdict does not preclude the imposition of sanctions.

The imposition of sanctions under K.S.A. 1990 Supp. 60-211 and K.S.A. 60-2007 is discretionary with the trial court, and its ruling on sanctions will not be disturbed on appeal absent an abuse of discretion. *Cornett v. Roth*, 233 Kan. 936, 945, 666 P.2d 1182 (1983). Judicial discretion is abused "only where no reasonable [person] would take the view adopted by the trial court. If reasonable [persons] could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion." *Stayton v. Stayton*, 211 Kan. 560, 562, 506 P.2d 1172 (1973).

K.S.A. 1990 Supp. 60-211 provides, in pertinent part:

"Every pleading, motion and other paper provided for by this article of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name . . . . The signature of a person constitutes a certificate by the person that the person has read the pleading; *that to the best of the person's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not imposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading, motion or other paper provided for by this article is signed in violation of this section, the court . . . upon notice and after opportunity to be heard, shall impose upon the person who signed it or a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees." (Emphasis added.)

K.S.A. 60-2007 also allows a trial court to assess attorney fees as part of the costs of an action, and the relevant portion of that statute provides:

"[I]f the court finds that a party, in a pleading, . . . has asserted a claim . . . without a reasonable basis in fact and not in good faith, the

court shall assess against the party as additional costs of the action, and allow to the other parties, reasonable attorney fees and expenses incurred by the other parties as a result of such claim . . . . An attorney may be held individually or jointly and severally liable with a party for such additional costs where the court finds that the attorney knowingly and not in good faith asserted such a claim . . . or, having gained knowledge of its falsity, failed to inform the court promptly that such claim . . . was without reasonable basis in fact." K.S.A. 60-2007(b).

In order to assess attorney fees under K.S.A. 60-2007(b), the trial court must find there was no reasonable basis in fact for the claim when it was asserted *and* that the claim was asserted in bad faith. *Summers v. Montgomery Elevator Co.*, 243 Kan. 393, 399, 757 P.2d 1255 (1988); *Rood v. Kansas City Power & Light Co.*, 243 Kan. 14, 24, 755 P.2d 502 (1988); *Smith v. Dunn*, 11 Kan. App. 2d 343, 346, 720 P.2d 1137 (1986).

This court in *Smith* determined that, under K.S.A. 60-211 and K.S.A. 60-2007, only "willful misuses of the judicial process" could be penalized by the imposition of sanctions. *Smith*, 11 Kan. App. 2d at 348. Subsequent to the *Smith* decision, K.S.A. 60-211 was amended by the legislature and the "willful" term was removed from the statute. See L. 1986, ch. 215, § 1. Now the statute provides for sanctions when a "pleading, motion, or other paper . . . is signed in violation of this section." K.S.A. 1990 Supp. 60-211. As noted above, under this statute a person's signature on a document to be filed in court is a certificate that the person has read the paper and "to the best of the person's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact." K.S.A. 1990 Supp. 60-211. Filing a pleading in court without first conducting a reasonable inquiry and determining that a claim has an adequate factual basis to support it is a violation of the statute.

The fact that a party's claim is ultimately denied does not, in and of itself, indicate that the claim was frivolous. *City of Shawnee v. Webb*, 236 Kan. 504, 512, 694 P.2d 896 (1985); *Smith v. Dunn*, 11 Kan. App. 2d at 346.

In granting the defendants' motions for sanctions, the trial judge commented that Reyna's "claim, at least, predominantly, and, perhaps, in its entirety, is, simply, not well-based or pursued in good faith by Mr. Reyna and whatever he told his attorney, and I think the record bears out the state of the evidence as produced

in this case to show that." Although the trial judge's language is ambiguous on which claim he found to be frivolous, his award of the defendants' total amount of attorney fees indicates that he concluded all of Reyna's material allegations were without a basis in fact and were pursued in bad faith.

The first issue to be discussed is whether the trial court's act of denying two defense motions for directed verdict forecloses imposition of sanctions based upon a finding that Reyna's lawsuit was frivolous. Reyna essentially argues that the trial judge's denial of the directed verdict motions constituted a judicial determination that his claims were not frivolous. The defendants argue that the Kansas Supreme Court's decision in *Rood* supports the proposition that sanctions are proper even though some valid claims may have been presented to the jury.

Neither party cites any cases directly addressing whether a plaintiff's case which overcomes defense motions for directed verdict can later be found to have been without a reasonable basis in fact. The trial judge was not aware of any, nor have we been able to find any. However, the trial judge concluded that, based upon his understanding of the statutes involved and the decisions in *Rood* and *Summers*, overruling motions for directed verdict does not preclude the imposition of sanctions.

In *Rood*, the Kansas Supreme Court "encourage[d] the Kansas trial courts to impose sanctions . . . to protect the litigants from harassment in clear cases of violation of professional duty." 243 Kan. at 22.

*Rood* is authority for the proposition that sanctions may be assessed when a frivolous *claim* is pursued through the legal process. *Rood* was a personal injury action wherein the plaintiff relied upon res ipsa loquitur to establish the negligence of the defendant. The trial of the suit resulted in a jury verdict for the plaintiff. 243 Kan. at 15. Despite the plaintiff's lack of knowledge of how the accident could have occurred but for the defendant's negligence, the plaintiff's attorneys alleged wanton misconduct and pursued a claim for punitive damages up until the time of trial. 243 Kan. at 24. However, at trial, the plaintiff's attorneys did not present any evidence of the defendant's wanton misconduct for the obvious reason that none existed. 243 Kan. at 24-25. Based upon these facts, the Kansas Supreme Court concluded

that the trial court did not abuse its discretion in assessing twenty percent of the defendant's total attorney fees as sanctions for pursuing the frivolous punitive damage claim and affirmed the trial court's decision on this issue. 243 Kan. at 24-25.

There is no indication that the punitive damage claim at issue in *Rood* was ever subject to attack by a motion for directed verdict. Further, *Rood* did not involve a finding by the trial court that the plaintiff's entire lawsuit was frivolous. The learned trial court merely found the punitive damages claim was pursued without a reasonable basis in fact. 243 Kan. at 24. Although *Rood* indicates that sanctions can be imposed where at least one frivolous claim is made but other claims based in fact go to the jury, it does not support the defendants' position in this case.

The *Summers* case also does not support the defendants' position. Sanctions were imposed in *Summers* where the plaintiff's attorney frivolously continued a claim against a party who, under Kansas law, could not be liable to the plaintiff. 243 Kan. at 399-400. The trial court held the plaintiff's attorney liable for attorney fees incurred after information developed through discovery disclosed that the defendant had no legal liability to the defendant; the Kansas Supreme Court affirmed. 243 Kan. at 399-400. The Supreme Court found no abuse of discretion because the plaintiff's attorney had not argued to modify or overrule Kansas law, which evidenced a lack of good faith on the part of plaintiff's counsel. 243 Kan. at 400-01. *Summers* was decided on the basis that the claim was without basis in law and was pursued in bad faith. It did not involve any defense motions for directed verdict challenging the plaintiff's factual basis for the suit.

When determining whether to grant a motion for directed verdict, the trial judge is required to "resolve all facts and inferences *reasonably to be drawn from the evidence*" in favor of the non-moving party and deny the motion if reasonable minds could differ based on the evidence. (Emphasis added.) *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 60, 755 P.2d 1319 (1988). When a directed verdict motion is not ruled upon or is denied by the trial judge, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." K.S.A. 1990 Supp. 60-250(c). If the case is submitted to the jury and a verdict is returned, upon motion,

the court is free to later disregard the jury's verdict, reopen the judgment, and either order a new trial or direct the verdict as if the initial motion for directed verdict had been granted. See K.S.A. 1990 Supp. 60-250(c).

The "flexible" nature of the court's initial denial of a motion for directed verdict undermines Reyna's argument that the court's denial in this case essentially constituted a judicial determination that the suit had some basis in fact. Presumably, K.S.A. 1990 Supp. 60-250(c) makes the initial determination a flexible one so that a trial judge faced with a weak case will not be compelled to invade the province of the factfinder by directing a verdict in favor of the moving party. Under the statute, a trial judge can deny the motion and leave it up to the jury to do the right thing. If, in the judge's opinion, it does not, he can later grant a new trial or direct the verdict for the moving party as warranted by the evidence.

In contrast, in determining whether a motion for sanctions should be granted, the court must conduct a two-part analysis addressing whether a reasonable basis in fact for the claim existed *at the time it was made* and whether the claim was pursued in good faith. See *Summers*, 243 Kan. at 399; *Rood*, 243 Kan. at 24; *Smith*, 11 Kan. App. 2d at 346.

At first blush it indeed seems totally inconsistent to deny motions for directed verdict but then find the suit had no basis in fact. However, in view of the statutory effect of denial of a directed verdict motion and considering the timing and differences in focus between the two motions, it does not appear that denying directed verdict motions would preclude the later imposition of sanctions based on a finding the suit or claim had no basis in fact when filed.

Were sanctions appropriate in this case? A detailed review of the record indicates they were.

## THE PLAINTIFF'S ALLEGATIONS

Reyna's petition essentially alleged that in November 1986 he was employed and earning $3,000 per month and that the defendants enticed him away from that employment by leading him to believe that he would be assigned General's Kansas City territory where General's previous subagent had earned in excess

of $10,000 per month. The petition further alleged that Reyna started working for General on January 2, 1987, and was promised a $2,000 per month draw against $25 per vehicle service contract sold; that he was assigned to the Kansas City territory for only two weeks before he was reassigned to Oklahoma City because Bogle's brother was given the Kansas City territory; that the defendants assigned him the Oklahoma City territory fraudulently because the territory had been previously assigned to someone else; that when he discovered the Oklahoma City territory was assigned to someone else he confronted the defendants, who promised he would be assigned the Texas territory commencing April 1, 1987; that General did not have a contractual right to the Texas territory when they promised to assign it to him; that the defendants terminated his employment on or about April 3, 1987; and that he remained unemployed through July 1987.

Reyna also filed with his motion to amend the petition to state a claim for punitive damages an affidavit alleging essentially the same facts. The affidavit expanded on the allegations in the petition in two important respects. Reyna alleged that he did not learn the Oklahoma City territory was assigned to someone else until after he arrived there, and he alleged that he did not learn that the defendants did not have a contractual right to sell in Texas until they admitted it to him on April 1, 1987.

## THE FRAUDULENT INDUCEMENT CLAIM

The defendants learned that Reyna's previous employer was Dick Schultz and deposed Schultz over the plaintiff's objections. Schultz's trial deposition was read into the record and his testimony established that Reyna was not regularly employed by him, nor promised compensation of $3,000 per month. Schultz testified that Reyna's only employment with him consisted of Reyna's assistance in moving some equipment to Arizona for which Schultz reimbursed Reyna's out-of-pocket expenses. Schultz also testified that Reyna volunteered to attempt to establish some Midwest dealers for Schultz's products, for which he was advanced some expense money with the understanding that any unspent funds were to be returned to Schultz. Schultz testified his understanding was that Reyna would spend approximately two weeks attempting to sign dealers on his way back to

Iowa, but when Reyna called him from Iowa approximately 30 hours after leaving Arizona he stopped payment on the check he had given Reyna. Schultz testified that the last time he saw Reyna was in September 1986.

Defense counsel informed Reyna's attorney of the above facts approximately three months before trial. However, Shelton alluded to the prior employment in his opening statement, and Reyna pursued the fraudulent inducement claim at trial, testifying that he left Schultz's employ to take a job with the defendants in November 1986. As noted above, the trial judge remarked that there were "real problems" with this claim because the evidence established that Reyna's employment with Schultz ended before Reyna was hired by General, but he let the claim go to the jury, in part, because there was some evidence at trial from which the jury could find that the defendants promised Reyna $2,000 per month salary but had no intention of paying him. Shelton apparently never made any attempt to investigate Reyna's claim of fraudulent inducement by checking Reyna's tax returns or contacting his former employer before filing suit.

The appellant's brief, in its statement of facts, contains a summary of the alleged investigation carried out by Shelton prior to filing the suit. The pre-filing investigation consisted of Shelton's assertion that Reyna's allegations were corroborated by other former employees of General. He states that these former employees told him they each had been treated similarly by the defendants. Shelton represented at least one of these former employees in a separate suit against the defendants. Relying upon the allegations of plaintiffs and potential plaintiffs with possible claims against the same defendants does not appear to be a "reasonable inquiry" into the factual basis of a lawsuit. K.S.A. 1990 Supp. 60-211.

THE BREACH OF CONTRACT AND LOST WAGES CLAIM

Reyna's petition alleged that he began his employment with General on January 2, 1987. At trial, he stated that he started working for General in November 1986. He also introduced at trial an exhibit he had prepared in April 1987, which purportedly showed that he began incurring expenses in the course of his employment with General on January 2, 1987. The November starting date was corroborated by the testimony of Reyna's father

and Reyna's wife. However, Bogle and McDavitt both testified that Reyna did not work for General prior to January 1987, and that the circumstances of his hiring were much different than what Reyna described.

Bogle and McDavitt testified that Reyna was an old friend of Bogle and had sought them out looking for work in late 1986, but General was in no position to hire Reyna. Then, in January 1987, General's subagent in the Kansas City territory quit without warning so Bogle and McDavitt hired Reyna for the limited purpose of helping them pick up contracts at Kansas City dealerships for which they paid him $200. They then offered him a job on a month-to-month basis at a salary of $1,000 per month, with the understanding that he would be a subagent for the State of Texas *if* they obtained the contractual right to sell there, a right which was in litigation at that time. They testified that Reyna was aware of the conditional nature of his employment. Reyna began training in Wichita but was sent to Oklahoma to train with General's subagent; he was to be transferred to Texas on April 1, 1987, if General got the territory and Reyna signed three Oklahoma dealerships.

The defendants learned they would not obtain the Texas territory on March 30, 1987, so they terminated Reyna's employment on April 1, 1987.

Reyna admitted in his deposition that he knew, prior to April 1, 1987, the defendants had no contractual right to sell service contracts in Texas. He also admitted that when he went to work in Oklahoma he knew that General already had a subagent there and that he would work jointly for General and the subagent. Both admissions directly conflict with allegations made in his affidavit in support of punitive damages. Trial testimony established that the Oklahoma subagent agreed to pay Reyna $1,000 per month in addition to the $1,000 per month salary General paid him. One of the Oklahoma subagent's checks to Reyna in the amount of $1,000 bounced and was covered by defendants. Reyna attempted to prove his claim that General agreed to pay him $2,000 per month by introducing into evidence his regular $1,000 General paycheck and the $1,000 General check given to cover the Oklahoma subagent's check.

Reyna apparently did have an employment contract with the defendants, but the contract came into existence much later than he alleged and the contract was conditioned upon uncertain future events. Reyna was promised a $2,000 per month salary with a $5 per contract sold override, but the promise was allegedly conditioned upon two events: (1) General's obtaining the contractual right to sell in Texas, and (2) Reyna's signing three Oklahoma dealerships for General prior to April 1, 1987. The agreement was embodied in a letter McDavitt wrote Reyna dated March 16, 1987. The condition regarding Reyna's signing of three accounts was contained in the letter, but the condition regarding the Texas territory was not.

Reyna did sign three accounts in Oklahoma, but the dealerships were not eligible for the GWOC program because they dealt exclusively in used cars.

The defendants' version of the entire period of Reyna's employment was consistent with a letter Bogle sent Reyna on April 1, 1987.

As noted above, Reyna pursued a claim for lost wages from the time of his termination until he was again earning $2,000 per month. However, his tax returns showed that he was employed after being terminated by the defendants for at least eight of the nine months remaining in 1987.

A reasonable inquiry into this case would have established that there was no factual basis for Reyna's claim that he had an unconditional agreement to work for the defendants for $2,000 per month.

Furthermore, the plaintiff's attorney never sent the defendants a demand letter prior to filing suit. Reyna argues that no demand letter was needed because court documents indicated that the defendants responded to a demand letter sent by Reyna's previous attorney which expressed an obvious inclination not to pay. He further argues this fact triggers the "some other good reason" exception to sending a demand letter which is stated in *Nelson v. Miller*, 227 Kan. 271, 285, 607 P.2d 438 (1980). This argument is not convincing. As the court indicated in *Nelson*, the overriding purpose of a demand letter is to provide some objective evidence that the attorney conducted reasonable inquiry into the factual

basis of the suit before filing the action. 227 Kan. at 284-85. Here, Shelton cannot provide such objective evidence.

Reyna's evidence in this case was virtually all circumstantial. He produced no direct evidence to support his claims that he worked for Schultz at a salary of $3,000 per month, that the defendants unconditionally promised him a job paying over $2,000 per month, or that he suffered lost wages resulting from the defendants' alleged breach of contract. The defendants' evidence was mostly circumstantial as well, but was much more consistent with the physical evidence available at the time the lawsuit was filed.

On these facts, it appears the trial judge did not abuse his discretion in imposing sanctions.

On the issue of whether the trial court's findings were adequate to establish that Reyna and Shelton exercised bad faith, Reyna contends that the trial court did not make the necessary subjective finding that this lawsuit was pursued in bad faith which is necessary to impose sanctions. After citing the trial judge's quotations stating that the plaintiff was untruthful in a number of regards and that Shelton did not conduct reasonable inquiry before filing suit and pursued the entire suit after it was incumbent upon him to inform the court that the factual basis of all or some claims was highly questionable, Reyna argues the trial judge's statements only address elements of the plaintiff's evidence. He also argues that the "reasonable inference" of bad faith resulting from Shelton's lack of diligence and inattention to contrary evidence alluded to in the defendants' memorandum in support of the motion for sanctions, which was adopted by the trial judge, is not sufficient.

Reyna's argument appears to be more of a challenge to the trial court's act of incorporating by reference the defendants' memorandum in support of the motion for sanctions, which the trial court adopted as its findings of fact and conclusions of law. In doing so, the trial court noted it was unusual to do that, but felt that the findings of fact and conclusions of law were accurate and to draft a journal entry setting out all the necessary findings would result in unnecessary duplication of efforts.

The memorandum adopted by the trial court adequately sets out the reasons for the judge's decision on this issue and contains the necessary findings. This appears to satisfy the findings and

conclusions requirements set out in K.S.A. 60-252 and Supreme Court Rule 165 (1990 Kan. Ct. R. Annot. 119). Therefore, Reyna's argument on this issue is without merit.

The judgment of the trial court is affirmed.