No. 67,736

FRANCES HELM GIBLIN, a/k/a FRANCES H. GIBLIN, an incapacitated person, by her brother and next friend, WILLIAM F. HELM, JR.; and WILLIAM F. HELM, JR., individually and on behalf of the beneficiaries of the Frances H. Giblin Trust No. 1 and First Supplemental Trust Agreement dated April 1, 1987, *Appellees*, v. CORNELIUS J. GIBLIN, III, a/k/a JIM GIBLIN, individually and as trustee under Third Supplemental Trust Agreement dated February 8, 1991; JUDITH GIBLIN, individually and as the purported successor trustee under Third Supplemental Trust Agreement dated February 8, 1991, and their attorney, MARVIN E. THOMPSON, *Appellants*.

(854 P.2d 816)

Opinion filed June 16, 1993.

*Marvin E. Thompson*, of Thompson, Arthur & Davidson, of Russell, argued the cause, and *Mark Arthur, Jr.*, and *Dennis R. Davidson*, of the same firm, were with him on the briefs for appellants.

*Paula J. Wright*, of Clark, Mize & Linville, Chartered, of Salina, argued the cause, and *Dana P. Ryan*, of the same firm, was with her on the briefs for appellees.

The opinion was delivered by

ABBOTT, J.: The trial court, pursuant to K.S.A. 1992 Supp. 60-211 and K.S.A. 60-2007, assessed attorney fees and expenses against Jim and Judy Giblin and their attorney, Marvin E. Thompson (appellants). They appealed. The Court of Appeals affirmed in an unpublished opinion filed November 13, 1992. We accepted review.

To resolve this issue, it is necessary to set forth many of the facts and, in so doing, to focus the issue directly on the appellants' knowledge and intent in filing a response to a motion William F. Helm, Jr., in various capacities, filed. He sought to enforce a purported settlement agreement set forth in a letter dated August 16, 1991. Also of some importance is the testamentary capacity of Frances Helm Giblin (Mrs. Giblin) on February 1 and 8, 1991.

Helm is the brother of Mrs. Giblin, who is 89 years of age, twice-widowed, and has an estate in excess of $6,000,000. Her first husband, George Eresch, was President and majority shareholder of the First National Bank of Beloit, Kansas. When George died in 1952, Mrs. Giblin inherited his interest in the bank, owning a majority of the bank's (later the holding company's)

shares. After her marriage in 1955 to Cornelius Giblin, II, Mrs. Giblin resided in Kansas City, Missouri. Cornelius died in 1968, and Mrs. Giblin continued to live in Kansas City, Missouri. Mrs. Giblin continued to vote in Beloit and to renew her Kansas driver's license. She appears to list her residence as Beloit in the trust instruments involved in this case.

Mrs. Giblin has no children. Her blood relatives include her brother and 10 nieces and nephews. Cornelius J. Giblin, III (Jim), who is married to Judith Giblin (Judy), is Mrs. Giblin's stepson.

Mrs. Giblin served as chairperson of the Board of Directors of the First National Bank of Beloit and took an active part in the management of the bank, her real estate holdings, and her investments. With regard to the bank's affairs, she received hands-on help from the bank's presidents, including Jerome J. Eilert, who has been president of the bank since 1983. Eilert also serves as president of First National Bankshares of Beloit, Inc., the bank's holding company.

In 1982, Mrs. Giblin executed to First National Bankshares of Beloit, Inc. a stock option that granted the holding company the right to purchase her stock in the holding company within one year after her death. In 1989, after creating a trust, she signed a second stock option that has no significance to this appeal.

In 1985, Mrs. Giblin created a revocable inter vivos trust and a pour-over will leaving her real and personal property to the trust. She designated Eilert and herself as co-trustees and Joe Geisel as successor trustee. Upon Mrs. Giblin's death, the trust provides for payment of specific sums and bequests of property to certain institutions and persons, with her blood relatives designated as the residuary beneficiaries.

In 1987, Jim and Judy, after living in other states for 22 years, returned to Kansas City, Missouri. Thereafter, they frequently took Mrs. Giblin to Mass, to the beauty parlor, to Beloit, etc. On four separate occasions from November 1990 through March 1991, Jim drove Mrs. Giblin from her home in Kansas City, Missouri, to Beloit to attend to bank and personal matters. Each trip lasted more than one day, and Jim remained in Beloit with Mrs. Giblin until the business was completed.

On February 1, 1991, while in Beloit, Mrs. Giblin executed changes to the trust in the presence of Adley E. Johnson, her

CPA and tax advisor, Eilert, and Jim. The same Salina law firm that prepared the earlier trust instrument prepared these changes. The revisions included revoking the 1989 stock option; changing the trust residuary beneficiaries to include Jim and Judy, to delete three of the nieces' and nephews' residuary shares, and to revise other nieces' and nephews' residuary shares; and replacing the current successor trustee with Jim. Mrs. Giblin also authorized Jim to have her durable power of attorney for health care decisions. At that meeting, she wrote a check in the amount of $10,000 to Jim and Judy. Her CPA, Johnson, had advised her to begin making $10,000 gifts to all of her trust beneficiaries for tax reasons; however, gifts to other beneficiaries were not made.

On February 6, 1991, Jim contacted a Kansas City, Missouri, attorney, Alex H. Flemington. On February 8, 1991, Jim accompanied Mrs. Giblin to Flemington's office to discuss further revisions to her estate plan. On that date, pursuant to a document Flemington prepared, Mrs. Giblin amended her trust once again. She named Jim as her new co-trustee, which removed Eilert from that position, and she also named Judy as successor trustee. Eilert's share of the trust estate was changed from stock in the holding company to cash. Another provision stated that any beneficiary who challenged the trust's validity would forfeit his or her share of trust property. Additionally, Mrs. Giblin gave Jim a durable power of attorney that authorized him to transfer property to the trust at his discretion. On February 8 and 18, 1991, Mrs. Giblin sent Eilert letters in which she notified him of these changes. On March 8, 1991, Mrs. Giblin sent Eilert another letter in which she requested a special meeting of the bank's shareholders and directors for the purpose of electing Jim to the bank's Board of Directors. Flemington prepared these letters.

On March 14, 1991, Mrs. Giblin fractured her foot in a fall. When Dr. Thomas A. Coppinger, Mrs. Giblin's personal physician, treated her, he observed a "marked mental deterioration" since December 18, 1990, when he last had seen her. The record before us does not contain a report of the December 18, 1990, examination but, in our opinion, Dr. Coppinger's reference to that examination takes on some significance. The March 1991 CAT scan revealed cerebral atrophy, a shrinkage of the brain. Dr. Coppinger recommended 24-hour care and the appointment

of a guardian to handle Mrs. Giblin's affairs. We note the February 1, 1991, trust amendment was executed almost exactly half-way between the December 18, 1990, examination and the March 14, 1991, examination and Dr. Coppinger refers to a "marked mental deterioration" between the two examinations; thus, a reasonable conclusion would be that the deterioration took place between the two dates.

On March 15, 1991, Mrs. Giblin's blood relatives filed a petition in Jackson County, Missouri, for the appointment of a guardian and conservator for her. The Missouri court subsequently appointed Dr. John H. Wisner, a psychiatrist, to evaluate Mrs. Giblin's mental status, including

"[her] testamentary capacity and her capacity to understand the significance of financial transactions involving the administration of a trust consisting of real and personal property having a value of in excess of six million dollars together with her ability to understand the significance of the transactions reflected in the documents executed February 1st and 8th, 1991."

On April 30, 1991, Jim and Judy filed a petition to be named co-guardians and co-conservators. On May 22, 1991, Helm filed suit in Kansas on behalf of Mrs. Giblin, himself, and her other blood relatives who were original trust beneficiaries (appellees) against Jim and Judy to set aside the February 1991 transactions. The suit alleged that these transactions were "void because of [Mrs. Giblin's] lack of mental capacity"; that Mrs. Giblin signed these documents because of Jim and Judy's "influence, fraud, lack of good faith, and overreaching"; and that Jim and Judy "breached their confidential relationship by exercising undue influence over [Mrs. Giblin]." The appellees asked for a temporary restraining order to prevent transfers of property from Mrs. Giblin's trust, which the trial court granted on September 23, 1991.

Dr. Wisner submitted his report on June 3, 1991. He concluded that Mrs. Giblin suffered from "Dementia (Chronic Organic Brain Syndrome), of a profound severity, long-standing and slowly progressive in nature, of at least six months' duration, and most probably of one year's duration" and from "Progressive Dementia of the 'Alzheimer's type.' " In the doctor's opinion, from February 1 through 8, 1991, Mrs. Giblin "lacked testamentary capacity and the ability to understand the significance of financial

transactions involved in the administration of a trust consisting of real and personal property of any value."

On August 1, 1991, Jim and Judy, as well as Mrs. Giblin's brother and seven of her nieces and nephews, signed a stipulation to be filed with the Missouri court. Included in the stipulation was the parties' agreement that, based upon Dr. Coppinger's report of March 15, 1991, Mrs. Giblin was incapacitated, disabled, and in need of a guardian and conservator. On August 1, the Missouri court incorporated the stipulation into its judgment, adjudged Mrs. Giblin to be incapacitated and disabled, and appointed one of Mrs. Giblin's nephews as her guardian and conservator.

On August 8, 1991, attorneys for the appellees and the appellants began negotiations to settle the case. The appellees were represented by Aubrey G. Linville of Clark, Mize & Linville, Chartered, of Salina, Kansas, in the Kansas litigation. Jim and Judy were represented by B. John Readey, III, of Smith, Gill, Fisher & Butts, of Kansas City, Missouri. Linville subsequently filed an affidavit stating he was "certain" Readey consulted with Jim and Judy during all stages of the negotiation. Linville also asserted in his affidavit that he and Readey reached an agreement on August 16, 1991, and that Readey agreed to confirm the terms in writing. According to Linville, he and Readey concurred that, because of Mrs. Giblin's incapacity, all interested parties would need to sign a formal settlement agreement, which Linville agreed to prepare, and the trial court would need to approve the settlement.

Readey did send Linville a letter on August 16, which began:

"The purpose of this letter is to confirm in writing the settlement agreement . . . which has been reached between our clients, Jim and Judy Giblin, and your clients, which we understand are Bill Helm and the beneficiaries of the Frances H. Giblin Trust No. 1 dated October 1, 1985, as amended by the First Supplemental Trust Agreement dated April 1, 1987."

The letter next discussed that although his clients did not admit truth in the appellees' allegations, Jim and Judy were willing to settle to avoid the duress and expense of continued litigation. The terms of the settlement were that Jim and Judy would retain the $10,000 gift received from Mrs. Giblin in February 1991 and that upon Mrs. Giblin's death, Jim and Judy would receive the

engagement and wedding rings Jim's father had given to Mrs. Giblin, which had a value of $50,000 or more. The letter concluded:

"Finally, Jim and Judy Giblin have agreed to sign whatever instruments may be necessary to effect the foregoing settlement and we understand that your clients have agreed to similar effect. . . .

. . . .

"We ask that the foregoing settlement agreement be formalized in a written agreement signed by all of the necessary parties . . . . We would expect your office to prepare the agreement(s)."

On August 20, 1991, according to Linville's affidavit, he contacted the trial judge and informed him the case had been settled.

Linville also asserted in his affidavit that when he telephoned Readey on August 22, 1991, to discuss procedural matters relating to the settlement, Readey did not mention his clients had problems with the settlement. In a letter sent to Readey on September 6, 1991, Linville stated: "I have a draft of a Settlement Agreement ready . . . . *We want to have the agreement reviewed by the family members before sending it to . . . you.*" On September 11, 1991, Linville sent Readey a copy of the preliminary draft of the settlement agreement. The letter begins: "Enclosed . . . *is a copy of a preliminary draft of a Settlement Agreement . . .* based upon the terms that [you] and I negotiated." (Emphasis added.)

On September 16, 1991, Readey sent a letter to Jim and Judy, in which Readey enclosed a copy of "the draft of the proposed Settlement Agreement." In the letter, Readey discussed several matters with which he was concerned:

"[T]here are at least a few items which either are inaccurate, were not discussed, or represent attempts to accomplish more in the Settlement Agreement than our earlier settlement discussions concluded. In any event, please review the Agreement and give us your thoughts. We will send you our proposed revisions shortly.

"One of the concerns we have with the draft is their apparent attempt to obtain your waiver of any interest in Frances' estate, either as it exists now or as it may exist in the future. Considering the possibility that upon the advent of some miracle drug, she could regain her faculty and amend her trust to include you, it is hardly appropriate for you to waive your interest in her estate once and for all. Thus, we will want a change in that provision of the Agreement.

"The Agreement also would have you agree to absorb your attorney's fees in both the Missouri and Kansas proceedings. This issue was never discussed by me with Aubrey Linville. . . . [W]e cannot agree to the referenced provision."

According to Linville's affidavit, when he had not heard from Readey by September 26, 1991, he sent a letter reminding him of the scheduled telephone conference between the trial court and counsel on October 1, 1991.

On October 1, 1991, after the conference call commenced, Charles W. Gordon, Jr., another attorney with Smith, Gill, Fisher & Butts, advised that Jim and Judy did "not desire to settle . . . at this time." Gordon also stated that Jim and Judy were in the process of hiring new counsel and that Smith, Gill, Fisher & Butts was withdrawing from the case.

Linville filed a second affidavit in which he stated he called Readey on the morning of October 2, 1991, to ask why Jim and Judy no longer wanted to settle. Readey was not available, so Linville left a message. Later that morning, Gordon, of Smith, Gill, Fisher & Butts, called Linville on Jim and Judy's behalf to discuss a continuance for discovery. Linville said that when he asked Gordon "what had gone wrong with the settlement," Gordon would not discuss the matter. Linville also mentioned he had left a telephone message for Readey, to which Gordon responded that he doubted Readey would want to discuss it with Linville and that Readey most likely would give his version only by deposition.

On October 8, 1991, the appellees filed a motion to enforce the settlement agreement based upon Readey's August 16 letter to Linville. The appellees also claimed they and Mrs. Giblin's co-guardians ad litem were entitled to recover all attorney "fees and expenses incurred in enforcing the agreed settlement."

Also in the second affidavit, Linville set forth a telephone conversation he had on October 24, 1991, with Jim and Judy's new attorney, Marvin E. Thompson, of Thompson, Arthur & Davidson, of Russell, Kansas. Linville said he asked Thompson why Jim and Judy wanted to back out of the agreement. According to Linville, Thompson's response was that there had been no agreed-upon settlement. Linville stated he then described the negotiating process in detail and informed Thompson he (Linville)

had no doubt Jim and Judy authorized Readey to settle the case. Linville said he initiated a conversation about the merits of the case, arguing there was no reason to continue the litigation because Mrs. Giblin had been determined incapacitated in February 1991. According to Linville, he asked Thompson if Thompson had seen a copy of Dr. Wisner's report, and when Thompson replied in the negative, Linville offered to send a copy. Linville warned Thompson that if Jim and Judy persisted in repudiating the settlement agreement and pursuing pointless litigation, Linville would seek recovery of attorney fees and expenses for his clients and for Mrs. Giblin's co-guardians ad litem.

On October 24, 1991, in follow-up of their telephone conversation, Linville sent a letter to Thompson. With the letter, Linville enclosed a copy of the appellees' motion to enforce the settlement, memorandum in support of the motion, Dr. Wisner's report, and the letters from the judge in the Missouri proceedings to Dr. Wisner and Claudia York, one of Mrs. Giblin's guardians ad litem. Linville again informed Thompson that if Jim and Judy persisted in moving forward with the litigation, Clark, Mize & Linville, Chartered, would attempt to recover attorney fees and expenses for the appellees and the guardians ad litem.

In the second affidavit, Linville related a telephone conversation he had with Thompson on October 31, 1991. Linville said Thompson acknowledged receipt of Dr. Wisner's report, but mentioned the doctor had not had the benefit of Alex Flemington's and Adley Johnson's testimony when he made his report. According to Linville, Thompson acknowledged he had yet to visit with Johnson and did not know if Johnson's testimony would make any difference.

On November 5, 1991, Thompson filed Jim and Judy's response to the appellees' motion, arguing: (1) There was no meeting of the minds with regard to the terms of the settlement agreement; (2) the appellees did not accept Readey's letter of August 16, 1991, as a final settlement agreement because each appellee first had to approve the preliminary draft; (3) Readey did not consider the preliminary draft a final settlement agreement, based upon his letter of September 16, 1991, to Jim and Judy; and (4) Readey did not have authority to enter into an oral or informal settlement agreement on Jim and Judy's behalf. To support the latter ar-

gument, Thompson submitted an affidavit from Jim in which Jim stated he "felt" there was no settlement "unless it was in writing and signed by all parties." Jim also said he did not authorize Readey to settle the case without the settlement being reduced to writing and signed by Jim and Judy.

At the hearing conducted on November 6, 1991, the attorneys agreed there was sufficient written material in the record for the court to rule whether there was a settlement as a matter of law. Thompson argued there was no settlement agreement because the agreement was not reduced to writing and signed by all parties as contemplated by both the appellees and Jim and Judy. Thompson also maintained that although Helm had filed the suit on behalf of the beneficiaries, not all of the beneficiaries were parties to the suit; that K.S.A. 1992 Supp. 60-217 does not allow a beneficiary to bring suit in a representative capacity for other beneficiaries; and that nonparty beneficiaries were "contingently necessary parties." Thompson pointed out the settlement agreement raised or lowered several of the nieces' and nephews' residuary interests in the trust and, in fact, entirely eliminated the interests of three of the nieces and nephews.

Mrs. Giblin's guardians ad litem were present and participated in the hearing. At the court's request, York, one of the two guardians ad litem, testified. York stated that during a telephone conversation on August 20, 1991, Readey informed her a settlement agreement had been reached and that during a telephone conversation on September 20, 1991, Readey told her the preliminary draft of the settlement agreement sent to her was the agreement into which his clients had entered and the collateral issue of attorney fees had not yet been resolved. York testified she also spoke with Linville on September 20 and Linville acknowledged the issue of attorney fees had not been discussed, but he considered it a collateral issue. York said her understanding on September 20 was "that everyone was waiting for final approval of the documents as to form."

Dana P. Ryan, an attorney with Clark, Mize & Linville, Chartered, argued the appellees' cause at the hearing and informed the trial court that the firm represented Mrs. Giblin's nieces and nephews as well as Mrs. Giblin's brother. It was argued Jim, Judy, and their counsel were aware Clark, Mize & Linville also

represented Mrs. Giblin's nieces and nephews, based upon Readey's letter of August 16, 1991, to Linville that refers to Linville's clients as "Bill Helm and the beneficiaries of the trust." A number of beneficiaries other than Mrs. Giblin's blood relations do not appear to be represented by Clark, Mize & Linville. In fact, several do not appear to be represented. Thompson argued there was nothing of record to show the firm represented the nieces and nephews in addition to representing Helm. The trial court determined there was sufficient evidence to support the finding that Clark, Mize & Linville, represented Mrs. Giblin's brother, nieces, and nephews, but permitted the appellees' attorney to submit affidavits from the nieces and nephews to that effect.

On December 10, 1991, the trial court granted the appellees' motion to enforce the settlement agreement as evidenced by Readey's letter of August 16, 1991, to Linville. The trial court found the letter "clearly" showed the parties had reached a settlement agreement because it explicitly stated that an agreement had been reached and that Jim and Judy agreed to sign whatever documents were necessary. The trial court also determined Mrs. Giblin's nieces and nephews who were not named parties to the suit gave authority to Clark, Mize & Linville to settle the case. The court noted: "There is no evidence to suggest that the blood relatives' attorneys failed to timely and properly consult them concerning potential conflicts of interest in the settlement of the case." The trial court also concluded there was no evidence in the record, including Jim's affidavit, to suggest Readey did not have authority to settle the matter. The court determined Jim and Judy did not disavow the settlement agreement in a timely manner. Jim and Judy did not appeal the trial court's ruling.

On January 7, 1992, the trial court conducted a hearing on the motion for attorney fees and expenses. Thompson argued that the record showed a written settlement agreement was a condition to settlement because Readey's letter of August 16, 1991, provided for a "formal settlement agreement" and because the preliminary draft of the settlement agreement provided for the signatures of all trust beneficiaries. Thompson asserted that "all trust beneficiaries were not parties to the litigation"; that K.S.A. 1992 Supp. 60-217 does not authorize one beneficiary, such as Helm, who filed the suit, to sue on behalf of all trust beneficiaries;

and that trust beneficiaries who were not parties to the litigation would not be bound by the settlement agreement unless they signed the agreement. Thompson pointed out that in Jim's affidavit he stated Readey was not authorized to settle the case if the agreement did not provide for a written settlement agreement signed by all the parties. Additionally, Thompson maintained the record does not show the appellees' attorney complied with MRPC 1.8(g) (1991 Kan. Ct. R. Annot. 265), which requires an attorney representing multiple clients with conflicting interests in an aggregate settlement to inform the clients of the existence and nature of the claims and the participation of the parties involved and to obtain the consent of each in advance.

On January 21, 1992, the trial court granted the appellees' motion, finding a violation of K.S.A. 1992 Supp. 60-211 and K.S.A. 60-2007. The court reasoned the appellants "presented and pursued claims and defenses that were without a reasonable basis in fact and not in good faith" and "without making reasonable inquiry or investigation." As a result, the trial court assessed attorney fees and expenses against Jim, Judy, and Thompson, jointly and severally, in the amount of $19,755.07. The court determined the appellees had incurred $14,685.50 in attorney fees and $610.87 in expenses and Mrs. Giblin's co-guardians ad litem had incurred $4,328.58 in attorney fees and $130.12 in expenses.

Jim and Judy and their attorney, Thompson, appealed from the assessment of attorney fees and costs against them. The Court of Appeals affirmed, and this court accepted review.

The appellants argue the trial court abused its discretion in assessing fees and expenses against them, pursuant to K.S.A. 1992 Supp. 60-211 and K.S.A. 60-2007. The statutes provide, in pertinent part:

"Every pleading, motion and other paper provided for by this article of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name . . . . The signature of a person constitutes a certificate by the person that the person has read the pleading; that to the best of the person's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that it is not imposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the

cost of litigation. . . . If a pleading, motion or other paper provided for by this article is signed in violation of this section, the court, upon motion . . . shall impose upon the person who signed it or a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including reasonable attorney fees." K.S.A. 1992 Supp. 60-211.

"(b) At the time of assessment of the costs of any action to which this section applies, if the court finds that a party, *in a pleading,* motion or response thereto, *has asserted a claim* or defense, including setoffs and counterclaims, *or has denied the truth of a factual statement in a pleading or during discovery, without a reasonable basis in fact and not in good faith,* the court shall assess against the party as additional costs of the action, and allow to the other parties, reasonable attorney fees and expenses incurred by the other parties as a result of such claim, defense or denial. An attorney may be held individually or jointly and severally liable with a party for such additional costs where the court finds that the attorney knowingly and not in good faith asserted such a claim, defense or denial or, having gained knowledge of its falsity, failed to inform the court promptly that such claim, defense or denial was without reasonable basis in fact.

. . . .

"(d) *The purpose of this section is not to prevent a party from litigating bona fide claims or defenses, but to protect litigants from harassment and expense in clear cases of abuse."* (Emphasis added.) K.S.A. 60-2007.

"Two separate requirements must be met before attorney fees and expenses can be assessed pursuant to K.S.A. 60-2007(b): (1) The claim asserted was without reasonable basis in fact; and (2) the claim was not asserted in good faith." *Rood v. Kansas City Power & Light Co.,* 243 Kan. 14, Syl. ¶ 4, 755 P.2d 502 (1988). "[An appellate court] must look at whether there was a 'reasonable basis in fact' for the claim when it was asserted, *and* whether the claim was asserted in good faith." *Smith v. Dunn,* 11 Kan. App. 2d 343, 346, 720 P.2d 1137 (1986). "The fact that a party's claim is ultimately denied does not, in and of itself, indicate that the claim was frivolous." *Reyna v. General Group of Companies,* 15 Kan. App. 2d 591, Syl. ¶ 3, 814 P.2d 961, *rev. denied* 248 Kan. 996 (1991).

In determining whether to assess attorney fees and costs pursuant to K.S.A. 60-2007(b), the appellate court's first function is to determine whether substantial competent evidence supports the trial court's findings of fact that the pleading does not have a reasonable basis in fact and is not asserted in good faith. See

*Gillespie v. Seymour,* 250 Kan. 123, Syl. ¶ 1, 823 P.2d 782 (1991). The appellants contend the presentation of facts in the instant case allows this court to ascertain de novo what the facts prove. In *Kneller v. Federal Land Bank of Wichita,* 247 Kan. 399, Syl. ¶ 2, 799 P.2d 485 (1990), this court held:

"Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions, and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below and to determine de novo what the facts establish."

See *Stith v. Williams,* 227 Kan. 32, Syl. ¶ 2, 605 P.2d 86 (1980); *Crestview Bowl, Inc. v. Womer Constr. Co.,* 225 Kan. 335, Syl. ¶ 2, 592 P.2d 74 (1979); *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.,* 224 Kan. 347, Syl. ¶ 2, 582 P.2d 236 (1978); *American States Ins. Co. v. Hartford Accident & Indemnity Co.,* 218 Kan. 563, Syl. ¶ 4, 545 P.2d 399 (1976); *Reznik v. McKee, Trustee,* 216 Kan. 659, Syl. ¶ 7, 534 P.2d 243 (1975); *Todd v. Lakeland Chrysler-Plymouth-Dodge, Inc.,* 17 Kan. App. 2d 1, 4, 834 P.2d 387 (1992). That exception, however, has been held not to apply in cases in which oral testimony has been heard. *Bell v. Tilton,* 234 Kan. 461, 468, 674 P.2d 468 (1983); *In re Estate of Broadie,* 208 Kan. 621, Syl. ¶ 1, 493 P.2d 289 (1972).

The appellees contend this court cannot determine de novo what the facts establish because the evidence includes testimony taken at the hearing. The record on appeal does include four and one-half pages of sworn testimony by Claudia York, one of Mrs. Giblin's co-guardians ad litem.

The rationale behind not allowing appellate de novo determination of facts in a case involving witness testimony is that we do not weigh conflicting testimony. There was no conflicting evidence presented, written or oral, to contradict York's testimony about her conversations with Readey and Linville. Thompson did not even cross-examine York. York's testimony is arguably no different than the affidavits submitted. Additionally, at the November 6, 1991, hearing, the parties agreed there was sufficient written evidence for the trial court to decide the case. The trial court even noted this in its memorandum decision. It was at the

court's request that York testified. In this situation, we can determine de novo what the facts establish.

The appellees also contend this court cannot determine de novo what the facts establish because the standard of review is abuse of discretion. The appellants' argument concerns the manner in which this court reviews the evidence, not the standard of review. Abuse of discretion—whether the trial court's actions were arbitrary, fanciful, or unreasonable or whether any reasonable person would agree with the trial court's actions—necessitates a review of the evidence. In so doing, this court either can determine de novo what the facts establish or this court can determine if the statutory requirement of having a reasonable basis in fact has been met. Abuse of discretion and a de novo determination of what the facts establish are not necessarily mutually exclusive.

The appellants argue they had a reasonable basis in fact to oppose the appellees' motion to enforce the settlement agreement. What constitutes a reasonable basis in fact is decided on a case-by-case basis. See *Rood*, 243 Kan. at 23. The appellants contend a reasonable basis in fact means *any evidence* to support their position. See *City of Shawnee v. Webb*, 236 Kan. 504, 512, 694 P.2d 896 (1985) ("The fact that the landowners did not prevail in their motion to tax costs does not make the motion frivolous; *a factual basis* existed upon which the motion was based." [Emphasis added.]).

In *Smith v. Dunn*, 11 Kan. App. 2d 343, the plaintiffs hired Dunn to construct a chimney and fireplace for a woodburning stove. Fire subsequently damaged the plaintiffs' home. The fire originated in the wall near the woodburning stove—combustible materials in the wall were left too close to the uninsulated stovepipe that went through the wall to the chimney flute. The plaintiffs sued Dunn and, after learning the Rickels were somehow involved in the construction, included the Rickels as defendants. The trial court granted the Rickels' motion for summary judgment and for recovery of attorney fees and costs. The Court of Appeals disagreed with the trial court's factual analysis of the case and reversed the judgment against the plaintiffs' attorney, stating:

"In determining whether plaintiffs' attorney had a reasonable basis in fact to assert a claim against the Rickels, the trial court broke its analysis down

to whether there was any evidence to support a claim that the Rickels were negligent in their performance of either the exterior or the interior work. The court then concluded the fire was caused by the interior work and that the evidence tying the Rickels to the job all related to earlier exterior work. This interior/exterior analysis is too simplistic and it ignores the fact the fire started in the wall—between the interior and exterior work. It would appear logical that either Dunn working from the inside or the Rickels working from the outside could have some part in constructing the hole through the wall and preparing the hole for the placement of the stovepipe. Plaintiffs' attorney had a reasonable basis in fact to file a claim against the Rickels." 11 Kan. App. 2d at 348.

The question before this court is whether the appellants had a reasonable basis in fact for rejecting the settlement agreement as of November 5, 1991. The appellants are not subject to sanctions because of their oral rejection of the settlement agreement on October 1, 1991. The claims of the party subject to sanctions must be in "a pleading, motion or other paper," K.S.A. 1992 Supp. 60-211, or "in a pleading, motion or response thereto," K.S.A. 60-2007. Thus, November 5, 1991, is the operative date because it is the date the appellants responded to the motion to enforce the settlement agreement.

The appellants assert that their November 5, 1991, response objected to the appellees' motion to enforce the settlement agreement on two grounds: (1) Readey's letter of August 16, 1991, to Linville and (2) all trust beneficiaries "would not necessarily be bound by any order upholding the letter as settlement of the case" because they were not parties to the litigation

With regard to the August 16 letter, the basis of the appellees' motion to enforce the settlement, the appellants point to the following language: "We ask that the foregoing settlement agreement be formalized in a written agreement signed by all the necessary parties . . . ." The appellants contend that Linville's letters of September 6 and 11, 1991, indicate he understood this was a condition of the settlement. On September 6, Linville sent Readey a letter informing him a draft of the settlement agreement had been prepared and would be reviewed by Mrs. Giblin's blood relatives before Linville sent a draft to Readey. In Linville's letter of September 11 to Readey, Linville referred to the enclosed document as "a preliminary draft" of the settlement agreement that he and Readey had negotiated. In that same letter, Linville

stated: "It is our opinion that the Settlement Agreement should be submitted to Judge Tuggle for approval in both Kansas cases, once all of us have approved it." Additionally, Jim Giblin submitted an affidavit with the appellants' November 5 response, stating that he felt there was no settlement unless it was in writing and all parties signed it and that he had not authorized Readey to settle the case unless the agreement was in writing and all parties signed it.

The appellees contend there is no evidence in the record that Jim and Judy or their attorney negotiated a written settlement agreement signed by all parties as a condition precedent to settlement. The appellees argue that the language of the August 16 letter does not create a condition precedent because the reference to the "foregoing settlement agreement" refers to an accomplished event, and the reference to "formalized in a written agreement signed by all" is only a request. See *Connor v. Hammer*, 201 Kan. 22, 439 P.2d 116 (1968).

The trial court was not persuaded by the appellants' arguments. The trial court found the August 16 letter "explicitly stated that a settlement had been reached, that [Jim and Judy] agreed to sign whatever instruments might be necessary to effect the foregoing settlement and requested that the settlement agreement be formalized in a written agreement." The court also concluded that, because Jim and Judy received a copy of the August 16 letter, they were aware of the settlement negotiations and that there was no evidence in the record, including Jim's affidavit, suggesting Readey did not have authority to settle the case. According to the trial court, Readey's letter of September 16, 1991, to Jim and Judy "made it clear that agreement had been reached *as to substantially all matters*." (Emphasis added.) According to the court, Jim and Judy "knew or should have known that the case was settled." Based upon the above, the court concluded the appellants had no reasonable basis in fact to argue that there was no settlement until the parties executed a formal written agreement.

The operative date concerning whether Jim, Judy, and Thompson acted in good faith and with a reasonable basis in fact was November 5, 1991. On that date, Thompson, as an attorney, was looking at a trust valued at over $6,000,000 from which his clients

would receive a substantial sum of money if successful. The trust amendment executed on February 1, 1991, was executed in front of a bank president and a certified public accountant who had known Mrs. Giblin for some period of time and both of whom could be expected not to have allowed a person to execute a trust amendment under circumstances that would cause the amendment to be set aside. In addition, Thompson's clients told him that they had not authorized their attorney to enter into a settlement and that they did not believe the settlement was complete until a written agreement was signed.

Additionally, Mrs. Giblin's then treating physician seemed to indicate she was mentally competent on December 18, 1991, some 45 days before she signed the amended trust. The letter upon which the trial judge relied can be read to reach a result contrary to the trial judge's interpretation. To dismiss the issues not agreed upon as "collateral" is leaving large sums unresolved. The question concerning attorney fees would appear to be substantial. The trial court awarded over $19,000 for the relatively simple motion for attorney fees and costs. The total cost of attorney fees for the actions in Kansas and Missouri would be much higher than the amount awarded for this motion for attorney fees and costs.

In addition, a $10,000 cash gift and some $50,000 in jewelry was at stake, and, from the appellants' position, the nieces and nephews who would need to be bound by the agreement were not parties to the action.

The party who asserts a pleading has no basis in fact and is not asserted in good faith has the burden of proving that assertion. While Jim and Judy's case is a closer call than Thompson's, we are satisfied the facts of this case show the response was filed with a reasonable basis in fact and in good faith. To hold otherwise would leave most litigants in a contested case in the position that, if the trier of facts found against them, attorney fees and expenses could be awarded against them. It also could occur in most breach of contract cases in which one of the parties asserts a claim or defense that is disputed and not believed by the trier of facts. We hold the trial court erred in awarding attorney fees and costs in this case and the Court of Appeals erred in affirming the trial court.

The appellants requested attorney fees and costs in the trial court, contending the appellees did not have a reasonable basis in fact to file their motion to recover attorney fees and costs. The appellants also maintain the appellees' motion to assess attorney fees and costs against the appellants was frivolous and filed for harassment purposes and, therefore, was not in good faith. The appellants argue the trial court should have assessed attorney fees and expenses against the appellees. The trial court did not err in refusing to grant the appellants attorney fees.

Both sides request attorney fees and costs on appeal. We find both requests to be without merit.

The judgments of the Court of Appeals and of the district court are reversed.

DAVIS, J., not participating.

TERRY L. BULLOCK, District Judge, assigned.