Nos. 94,176
94,888

JIMMY L. NUNGESSER, *Plaintiff/Appellee*, v. JOSH M. BRYANT, *Defendant/Third-party Plaintiff/Appellee*, v. EMCASCO INSURANCE COMPANY, *Third-party Defendant/Appellant*.

(153 P.3d 1277)

Opinion filed March 23, 2007.

*Teresa L. Watson*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause, and *Steve R. Fabert*, of the same firm, was with her on the briefs for appellant.

*Jacob S. Graybill*, of Graybill & Hazlewood, L.L.C., of Wichita, argued the cause, and *N. Russell Hazlewood*, of the same firm, was on the brief for plaintiff/appellee.

*Jeffery L. Carmichael*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause and was on the brief for third-party plaintiff/appellee.

The opinion of the court was delivered by

BEIER, J.: This case arises out of an auto accident in which plaintiff Jimmy L. Nungesser was seriously injured. It requires us to consider whether Kansas law permitted defendant Josh M. Bryant to pursue an action alleging negligent or bad faith failure to settle by his insurer, EMCASCO Insurance Company (EMCASCO), before his liability on Nungesser's personal injury claim had been established.

The district court permitted Bryant's claim against EMCASCO to go forward, and EMCASCO now appeals the determination that it must pay a $2 million consent judgment entered in favor of Nungesser and against Bryant, as well as attorney fees under K.S.A. 40-256 and K.S.A. 40-908.

A review of the relevant factual and procedural chronology is required for our analysis.

The accident occurred on July 8, 2002. Bryant, a minor, driving a pickup truck, failed to yield the right of way to Nungesser, who was riding a motorcycle. Nungesser suffered a serious brain injury.

For a period of time after the accident, Nungesser was hospitalized at Wesley Medical Center in Wichita, pursuant to a preferred-provider arrangement between Wesley and Nungesser's health maintenance organization, Coventry Health Care. After Nungesser was discharged, Wesley filed notice of a $45,532.85 hospital lien and served Nungesser, Bryant, and EMCASCO.

The Bryant family's auto policy with EMCASCO had a $300,000 single liability limit. EMCASCO received notice of the collision

and Nungesser's claim 2 days after the accident, and its claims adjuster, Bruce Fischer, began his investigation. During the third week of August 2002, when Fischer learned the extent of Nungesser's injuries, he suggested to EMCASCO that potential liability to Nungesser would exceed the policy limit and that EMCASCO should settle the claim.

Within a few days, Fischer extended an oral offer to Nungesser's wife, Carolyn, to settle for the policy limit, payment to be made in the form of a check made out to Nungesser and Wesley jointly. The Nungessers' attorney, David G. Crockett, discussed the offer with Fischer, including the Wesley lien. Crockett was investigating the validity of the lien, which he believed was contrary to law.

Fischer confirmed EMCASCO's earlier oral offer to settle for the policy limit in a September 4, 2002, letter to Crockett.

On September 30, 2002, Wesley submitted Nungesser's bill to Coventry. The amount due from the Nungessers personally, according to a Coventry statement sent to the Nungessers on October 4, 2002, was $180.

On October 2, 2002, Crockett drafted but never mailed a letter to Fischer. The draft expressed specific objections to the Wesley lien and suggested that the Nungessers were prepared to accept EMCASCO's offer of the policy limit if the settlement check were made payable to Nungesser and his attorney, rather than to Nungesser and Wesley.

On October 9, 2002, Carolyn Nungesser attempted to pay Wesley $180 with a "payment in full" notation on her check. She included a note, which read in part:

"I am enclosing our check for $180.00 to pay the enclosed bill.

"Your hospital [lien], 'Wesley's,' will not let [EMCASCO] pay $300,000.00 to Jim for our settlement.

"This check should take care of Wesley[']s bill. Please notify [EMCASCO] that you have withdrawn [the lien] immediately so we can conclude our settlement."

Wesley rejected the check marked "payment in full" and requested one without such a notation, as Coventry had not yet paid Nungesser's balance. The Nungessers offered no such payment.

On October 23, 2002, Fischer mailed a second letter to Crockett, offering to settle Nungesser's claim against Bryant for the policy

limit by forwarding a check payable jointly to Nungesser and Wesley. Fischer later testified that Crockett did not respond to this offer.

On October 28, 2002, Wesley served on Nungesser, Bryant, and EMCASCO an amended lien notice in the amount of $49,993. Approximately 1 month later, the Nungessers hired attorney Jacob S. Graybill to assist Crockett with claims against Bryant and Wesley.

On December 18, 2002, in a telephone conversation with Fischer, Crockett orally offered to settle Nungesser's claim in exchange for a $300,000 check payable to Nungesser and Crockett rather than to Nungesser and Wesley. Crockett also offered to escrow money in his trust account to address Wesley's $49,993 lien.

The next day, before taking time off during the holidays, Fischer left a telephone message for Crockett, stating that EMCASCO would not agree to settle unless Wesley was named as a joint payee on the check.

On December 31, 2002, Crockett sent the following letter to Fischer:

"This letter will recap our conversation on December 18 and your telephone message on December 19. . . . When we spoke on December 18, I told you that we were willing to accept your offer of coverage limits . . . but that we needed to make some arrangement with [EMCASCO] in order that we could do so without allowing Wesley Medical Center to control the settlement proceeds. . . . I offered to escrow money in my trust account so that we could settle with [EMCASCO] without capitulating to Wesley's demands. You told me you would look into this and call back the following day since you were getting ready to take some vacation time over the holidays. You did express some concern because you said Wesley's attorney, Curtis Loub, had been very aggressive in asserting Wesley's claims against our settlement proceeds.

"On December 19 you did call, and you left a message stating that, because of Wesley's demands, [EMCASCO] would not pay the settlement proceeds unless Wesley were named on the check—right along with Jim Nungesser—as a joint payee! Obviously this would mean that the only way Jim could receive any money from [EMCASCO] would be if he surrendered to all the claims of Wesley.

. . . .

"It would . . . seem to me that Wesley has interfered with Mr. Bryant's legitimate expectation that the limit of his liability insurance would be available to buy his release from a claim that obviously exposes him to literally millions of dollars of liability.

. . . .

"By persuading [EMCASCO] to refuse to pay the limit of Mr. Bryant's insurance policy directly to Mr. Nungesser, Wesley has deprived Mr. Bryant of what will probably be the only opportunity he will ever have to purchase his complete release in return for the proceeds of a policy of insurance he paid for.

"In light of the foregoing, Mr. Nungesser has no alternative but to evaluate other alternatives."

There is no dispute between the parties that Crockett's December 31, 2002, letter accurately described the events of December 18 and 19. When Fischer received this letter, he contacted EMCASCO's attorney, Charles Millsap, who in turn contacted Crockett on January 2, 2003, a Thursday. Millsap would later testify by way of affidavit that he had been given the impression when Fischer contacted him that an agreement to settle for the policy limit had already been reached. The parties also agree that no settlement offer was made by either party, nor any agreement reached, during the conversation between Crockett and Millsap on January 2. The two did discuss the potential for a lawsuit against Wesley. Crockett did not tell Millsap that Nungesser was prepared to file suit against Bryant within a few days.

Nungesser sued Bryant on January 6, 2003, the Monday following that Thursday, *i.e.*, 1 business day after the conversation between Millsap and Crockett. Nungesser's petition sought $10 million in damages.

One week later, Wesley filed a second amended lien notice, reducing the amount to $180. It released its lien altogether a month later.

On January 15, Graybill sent a lengthy letter to Millsap, enclosing a copy of the petition filed by Nungesser against Bryant. Among other things, Graybill's letter stated that the Nungessers terminated "any further negotiations calculated to relieve Mr. Bryant of the full measure of his liability in return for payment" of the policy limit of $300,000. He also referred to $2 million plus as an amount for which the case might settle. He questioned the manner in which EMCASCO had conducted Bryant's settlement negotiation, and further suggested that EMCASCO retain independent counsel for Bryant.

EMCASCO arranged for Marc Powell to defend Bryant in the suit filed by Nungesser; by early March, Bryant had hired Jeffery S. Carmichael to pursue a claim against EMCASCO. Powell filed Bryant's answer to Nungesser's petition on April 23, 2003. On June 11, 2003, Carmichael filed a third-party petition on Bryant's behalf, naming Wesley and EMC Insurance Company (EMC), EMCASCO's parent company, as defendants. Bryant later settled with Wesley and amended his third-party petition to substitute EMCASCO for EMC. He sought full indemnity from EMCASCO on tortious interference with contract and breach of fiduciary theories, claiming EMCASCO negligently or in bad faith failed to settle Nungesser's claim within its $300,000 policy limit before suit was filed.

EMCASCO moved to dismiss Bryant's third-party claims, arguing that a direct action against an auto insurer was prohibited and that it should not be a party to Nungesser's tort action against Bryant unless and until judgment against Bryant was entered. District Judge Richard T. Ballinger denied EMCASCO's motion on September 12, 2003, holding that the case did not qualify as a "direct action" but rather as an "indemnity claim," and that questions of fact remained to be resolved.

On the same day, EMCASCO filed an interpleader action in federal court; it paid $300,000 to the clerk for apportionment by the court; it asserted that Nungesser had entered into a legally binding settlement agreement before his suit against Bryant was filed; and it sought enforcement of this agreement. Nungesser and Bryant obtained a stay of the federal proceedings pending the outcome of this action. The federal case has since been dismissed.

The parties proceeded with discovery in this case in state court for nearly a year. In September and October 2004, they filed cross-motions for summary judgment on the settlement agreement issue, Nungesser arguing that no such agreement existed and EMCASCO and Bryant arguing that it did. Meanwhile, District Judge Karl W. Friedel conducted a pretrial conference in which he split the case three ways for the purpose of subsequent serial proceedings. He ruled that the court first would determine whether a binding settlement existed before suit was filed. If not, the parties would

then try whether Bryant was liable in negligence to Nungesser. If so, then the parties would try whether Bryant was entitled to indemnity through his third-party claims against EMCASCO.

On October 22, 2004, EMCASCO again attempted to obtain summary disposition in its favor on Bryant's third-party claims, this time filing a motion for summary judgment.

Pursuant to a mediation conducted in early November 2004, the parties entered into two agreements, one between Nungesser and Bryant, and one that also included EMCASCO.

Bryant and Nungesser agreed as between themselves to settle Nungesser's negligence claim against Bryant through the entry of a confessed judgment in the amount of $2 million. Bryant agreed to "pursue such claims as he may legitimately have against EMCASCO . . . for payment of the confessed judgment together with accrued interests and costs as Jim Nungesser may direct; provided, however, that Jim Nungesser shall save Josh Bryant harmless from all costs and expenses required to prosecute such action." Bryant also granted to Nungesser

"a partial assignment of his contractual rights against EMCASCO sufficient in scope to give Nungesser standing to join Josh Bryant as a party Plaintiff against EMCASCO in a lawsuit, or in the lawsuit now pending, to recover Bryant's and/or Nungesser's damages reflected by the confessed judgment aforesaid from EMCASCO. Nothing in this assignment shall prevent such action from being prosecuted in Bryant's name alone and such assignment shall enable and entitle Nungesser to continue to pursue EMCASCO in his name alone should Bryant fail to continue to pursue his claim against EMCASCO."

The second, separate agreement among Nungesser, Bryant, and EMCASCO was designed to be effective "[o]n the condition that Nungesser prevails on the settlement issue," and it provided:

"1. Josh Bryant, Jim Nungesser, and EMCASCO hereby agree for purposes of this limited settlement agreement that a reasonable estimate of the amount Josh Bryant will be found to be legally liable to pay to Jim Nungesser for his damages sustained as a result of bodily injury and property damage as a result of the subject accident is in the amount of $2,000,000.

"2. EMCASCO hereby agrees and consents that Josh Bryant may enter into a confession of judgment to Jim Nungesser in the amount of $2,000,000, in exchange for a covenant not to execute, without prejudicing in any way any rights Josh Bryant would otherwise have against EMCASCO, including, with-

out limitation, prejudicing any right he might otherwise have to assign his right to pursue claims for amounts in excess of policy limits against EM-CASCO allegedly caused by, or the result of, EMCASCO's negligence or bad faith."

EMCASCO further agreed to dismiss its appeal of the stay that was entered in the federal interpleader action, and to consent to immediate delivery to the state court clerk of the $300,000 it had paid into the federal court. All parties agreed not to attempt an interlocutory appeal of any of the rulings expected on the pending summary judgment motions. However, all parties agreed that any party would be able to appeal an adverse order on those motions once the district court had entered a final judgment on all issues.

On November 18, 2004, District Judge Paul W. Clark heard arguments on the parties' cross-motions for summary judgment on the issue of presuit settlement. The court held that, as a matter of law, there was no binding settlement. And, on December 1, Bryant served an offer to confess judgment in the amount of $2 million, in answer to which Nungesser filed an acceptance.

Approximately 2 weeks later, Judge Clark heard EMCASCO's motion for summary judgment on Bryant's third-party claims. He denied the motion, determining that a jury must decide whether EMCASCO's failure to deliver a settlement check payable to Nungesser and his attorney rather than Nungesser and Wesley was an act of negligence or bad faith. He also recognized the consent judgment in favor of Nungesser and against Bryant "in the reasonable amount of $2,000,000, pursuant to K.S.A. 60-2002(b), with the express consent of EMCASCO."

On January 3, 2005, EMCASCO filed another motion to dismiss, arguing that the November 2004 mediation agreement between Bryant and Nungesser precluded Bryant's indemnity claim. Judge Clark denied the motion a week later.

Judge Clark presided over a jury trial of Bryant's—and now Nungesser's—negligence and bad faith failure to settle claims against EMCASCO held January 11 through January 14, 2005. At the close of the plaintiffs' case, and again at the close of its own case, EMCASCO moved for a judgment as a matter of law. Judge Clark reserved ruling. Ultimately, the jury found EMCASCO had not

acted in bad faith but had acted negligently in failing to settle Nungesser's claim against Bryant before suit was filed. Judgment was entered in favor of Nungesser and against EMCASCO in the confessed amount of $2 million, and EMCASCO received an immediate credit of $300,000.

Bryant then filed a motion for attorney fees pursuant to K.S.A. 40-256 and/or K.S.A. 40-908. On February 11, 2005, Judge Clark heard argument on EMCASCO's motion for judgment as a matter of law and on Nungesser's motion for fees. The judge denied EMCASCO's motion, stating: "[T]he case was well tried. The jury was properly instructed, and the verdict is well supported by the evidence." The judge also determined that attorney fees were appropriate. After a later hearing, the judge set the amount of fees at $726,549.69.

## Denial of EMCASCO's First Motion to Dismiss

Although EMCASCO raises several issues for our consideration, our ruling on this issue is dispositive of much of this appeal. We therefore analyze and discuss it first.

As set out above, EMCASCO moved to dismiss Bryant's third-party negligence and bad faith failure to settle claims shortly after they were filed. On September 12, 2003, Judge Ballinger rejected EMCASCO's argument that the claims were, at best, premature. He ruled that the third-party claims against EMCASCO could be litigated simultaneously with the underlying tort action brought by Nungesser against Bryant, stating the suit against EMCASCO did not qualify as a "direct action" but rather as an "indemnity claim." He also said that questions of fact remained to be resolved.

We agree that questions of fact remained at that point regarding the appropriateness of EMCASCO's actions during the negotiations between Fischer and Crockett and between Millsap and Crockett before Nungesser's suit was filed. However, the judge erred. Simply put, an insured's action against his or her insurer for negligent or bad faith failure to settle a case must wait for the liability of the insured to be decided. A defendant in an auto liability case may not sue his or her insurer on such claims until the tort claim against him or her has been reduced to judgment.

As an initial matter, we note Nungesser's assertion that EM-CASCO failed to meet its burden to designate a record sufficient to establish this error. We disagree. Although neither the motion nor Bryant's response appear in the record on appeal, the record contains a transcript of the hearing on the motion, including the lawyers' arguments and Judge Ballinger's pronouncement that "there are factual issues, and that this is not a direct action, it is an independent damage, so to speak, indemnity claim." The hearing transcript adequately illuminates the choice put to the district court and makes the record more than sufficient to address this purely legal question.

When entertaining a motion to dismiss for failure to state a claim, the district court is required to assume that the facts alleged by the plaintiff are true. It is then required to draw any reasonable inferences from those facts and determine whether the facts and inferences state a claim, not only on the theory espoused by the plaintiffs, but on any possible theory the court can divine. There are sound reasons for a certain degree of judicial skepticism toward such motions. Under Kansas' notice pleading, a petition is not intended to govern the entire course of the case. Rather, the ultimate legal issues and theories on which the case will be decided are reduced to writing in the pretrial order, typically entered at the close of discovery. *Halley v. Barnabe*, 271 Kan. 652, 656-57, 24 P.3d 140 (2001); see *Bland v. Scott*, 279 Kan. 962, 963-64, 112 P.3d 941 (2005). Under this standard of review, we must uphold the district court's decision unless the allegations contained in Bryant's third-party petition against EMCASCO were not legally cognizable.

Bryant argues that K.S.A. 60-214 authorized his action against EMCASCO. K.S.A. 60-214, a part of the Kansas Code of Civil Procedure, states in pertinent part:

"At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and petition to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." K.S.A. 60-214(a).

Bryant is correct that this statute provides a *procedural* vehicle for a defendant, acting as a third-party plaintiff, to implead a third-

party defendant. Third-party practice is aimed at settling, in a single lawsuit, as many aspects of a controversy as possible. *U. S. Fidelity & Guaranty Co. v. Continental Ins. Co.*, 216 Kan. 5, 11-13, 531 P.2d 9 (1975) (defending party in negligence action could implead his two liability insurers to settle issue of which had duty to provide defense, coverage). However, K.S.A. 60-214 does not create any substantive rights. *Alseike v. Miller*, 196 Kan. 547, Syl. ¶ 1, 412 P.2d 1007 (1966). It does not answer the question of whether there was a legal basis for Bryant's claim against EMCASCO at the time Judge Ballinger conducted the September 2003 hearing on the motion to dismiss.

Kansas has long recognized an insured's action for negligence or bad faith against his or her insurer. See *Bollinger v. Nuss*, 202 Kan. 326, 332-33, 449 P.2d 502 (1969) (liability may be imposed against insurer for negligence or bad faith in defending, setting claim against insured); *Bennett v. Conrady*, 180 Kan. 485, Syl. ¶ 3, 305 P.2d 823 (1957) (insurer on liability or indemnity policy liable for full amount of insured's loss, including excess, for negligence or bad faith in defending, settling action against insured); *Anderson v. Surety Co.*, 107 Kan. 375, Syl. ¶ 1, 191 Pac. 583 (1921) (insurer liable for full amount of insured's loss, irrespective of policy limits, if negligent in conducting defense for insured). Although the third-party petition framed the causes of action against EMCASCO in fiduciary duty language, a negligence action sounds in tort, while an action alleging breach of a duty of good faith sounds in contract. See *Glenn v. Fleming*, 247 Kan. 296, 311-13, 799 P.2d 79 (1990); *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 920, 611 P.2d 149 (1980).

The key question in this case, and the basis of EMCASCO's argument, is not *whether* such an action can stand but *when*—the critical factor is timing. Was it permissible for Bryant's third-party suit against EMCASCO to proceed before the underlying tort action brought by Nungesser against Bryant had concluded?

Our review of Kansas case law persuades us that EMCASCO is correct that timing should have doomed the third-party action on EMCASCO's first motion to dismiss. A liability insurer is not properly a party in a tort action arising from an auto accident, and no

previous Kansas case has allowed an action against an insurer based on negligence or bad faith to proceed before a judgment has been reached in the underlying suit. *Glenn*, 247 Kan. 296 (bad faith claim brought in garnishment action against insurer after judgment received against insured); *Bollinger*, 202 Kan. 326 (garnishment proceeding to determine extent of insurer's liability where judgment rendered against insured exceeded policy limits; bad faith and negligence alleged); *Bennett*, 180 Kan. 485 (insurer settled with two of five claimants; three others received judgments against insured; insurer voluntarily made appearance, paid in rest of policy limits for court to divide pro rata in partial satisfaction of judgments; bad faith or negligence alleged); *Anderson*, 107 Kan. 375 (insurer failed to defend insured in negligence suit; judgment entered for plaintiff but verdict set aside; insurer refused postjudgment settlement offer for less than policy limit; new trial resulted in verdict exceeding limit; plaintiffs, insured commenced separate action seeking indemnity, claiming negligent failure to settle); *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan. App. 2d 153, 804 P.2d 1012, *rev. denied* 248 Kan. 997 (1991) (prevailing automobile accident victim, as assignee of other driver's claim, brought action against other driver's insurer, alleging wrongful denial of coverage); see also *White v. Goodville Mut. Cas. Co.*, 226 Kan. 191, 596 P.2d 1229 (1979) (where no personal jurisdiction over defendant, plaintiff attempted to sue defendant's insurer; insurer may not be made party to a lawsuit against its insured); *King v. American Family Ins. Co.*, 19 Kan. App. 2d 620, 623-24, 874 P.2d 691 (1994) (driver could not file separate action against insurer based upon the same claim; absent statute or insurance contract provision, insurer may not be made original party to lawsuit against its insured).

The cases cited by Bryant and Nungesser to support the opposite view, *i.e.*, that an insurer *can* be brought into an underlying tort suit are distinguishable. They involved joining an insurer to litigate the existence of coverage under an insured's policy. See *U. S. Fidelity & Guaranty Co.*, 216 Kan. 5 (defending party in negligence action could implead his two liability insurers to settle issue of which had duty to provide defense and coverage); *Heshion Motors*

*v. Western Intern. Hotels*, 600 S.W.2d 526, 536 (Mo. App. 1980) (insurer denied coverage and refused to defend suit; defendant permitted to implead insurer despite "no action [until final judgment]" provision in policy; "the occasion of impleading an insurer arises only in those limited instances where an insurer has disclaimed coverage and refused to defend on behalf of its insured"); see also *Jordan v. Stephens*, 7 F.R.D. 140, 142 (W. D. Mo. 1945) (insured may file complaint to join insurer as a third-party defendant and tender insurer as a defendant to satisfy plaintiff's claim where insured refused to defend the defendants or third-party plaintiffs in violation of insured's policy). Coverage is not contested here. The dispute focuses instead on the appropriateness of EMCASCO's presuit response to the Nungesser claim.

Our conclusion on the necessary sequence of events is also supported by language in Bryant's EMCASCO insurance policy:

"A. No legal action may *brought* against us [EMCASCO] until:
    1. We agree in writing that the insured has an obligation to pay; or
    2. The amount of that obligation has been finally determined by judgment after trial.
"B. No person or organization has any right under this policy to bring us into any action to determine liability of an 'insured.'"

It is also consistent with basic insurance law:

"A claimant cannot bring an action against an insurer seeking damages for the insurer's allegedly wrongful refusal to negotiate in good faith with the claimants where no excess judgment has yet been rendered against the insured. Therefore, a *cause of action for the bad-faith [or negligent] failure to settle a claim does not arise until there has been a final determination of the insured's liability and the claimant's damages, including resolution of any appeals.*" (Emphasis added.) 44 Am. Jur. 2d, Insurance § 1394, p. 622.

And it is further supported by cases from other jurisdictions. In *Blanchard v. State Farm Mut. Auto. Ins.*, 575 So. 2d 1289, 1291 (Fla. 1991), the Florida Supreme Court, in response to a question certified by the Eleventh Circuit Court of Appeals in the uninsured motorist context, settled a split among districts by holding that a cause of action for bad faith failure to settle did not accrue until the conclusion of the underlying litigation. Specifically, the court said:

"If an uninsured motorist is not liable to the insured for damages arising from an accident, then the insurer has not acted in bad faith in refusing to settle the claim. Thus, an insured's underlying first-party action for insurance benefits against the insurer necessarily must be resolved favorably to the insured before the cause of action for bad faith in settlement negotiations can accrue. It follows that an insured's claim against an uninsured motorist carrier for failing to settle the claim in good faith does not accrue before the conclusion of the underlying litigation for the contractual uninsured motorist insurance benefits. Absent a determination of the existence of liability on the part of the uninsured tortfeasor and the extent of the plaintiff's damages, a cause of action cannot exist for a bad faith failure to settle." 575 So. 2d at 1291.

In *Lexington Ins. Co. v. Royal Ins. Co. of America*, 886 F. Supp. 837 (N.D. Fla., 1995), the court relied on the *Blanchard* holding to dismiss a case in which an excess liability insurer had brought a state-court action against the primary liability insurer to recover for bad faith in failure to settle a tort case. The primary insurer moved for summary judgment, and the court held that questions of fact precluded summary judgment. However, the court also held that the excess insurer's claim against the primary insurer could not accrue while an appeal was pending in the underlying tort case; the primary insurer should have sought abatement of the litigation, rather than summary judgment. 886 F. Supp. at 840-42.

In *Vest v. Travelers Ins. Co.*, 753 So. 2d 1270, 1276 (2000), the Florida Supreme Court held in accord with *Blanchard* that bringing an action alleging failure to exercise good faith in settlement negotiations "is premature until there is a determination of liability and extent of damages owed on the first-party insurance contract."

Illinois appellate judges also have weighed in on this issue. In *Scroggins v. Allstate Insurance Co.*, 74 Ill. App. 3d 1027, 1032, 393 N.E.2d 718 (1979), plaintiff pedestrians brought an action against the driver of a vehicle and his father, seeking damages for injuries allegedly incurred when they were struck by the vehicle. The plaintiffs also included the defendant's automobile liability insurer as a defendant, alleging bad faith in failing to settle their claims. The district court dismissed the insurer from the action, and pedestrians appealed from the dismissal. The appellate court decided that, even if the automobile liability insurer acted in bad faith in refusing to settle claims against insureds within the policy limit, the pedes-

trians did not have cause of action against insurer on the basis of its breach of duty to negotiate in good faith. That duty was owed to insureds and not to them. While such a claim is assignable, the insureds had not assigned it; and, furthermore, even if plaintiffs' status as "potential judgment creditors" gave them standing to bring a bad faith claim, they would not have been permitted to pursue such a claim until liability of the defendant had been established. The court stated:

"Plaintiffs have cited, and we have found, no case in the country permitting a direct action against an insurer by a third party claimant at this stage of litigation, in the absence of statutory or contractual sanction of such an action. Neither have plaintiffs shown that the necessity for such an action outweighs the potential difficulties Allstate has argued are likely to ensue, such as the possibility that insurers will effectively be coerced into settling where their liability has not and may never be established. If plaintiffs do recover an excess judgment against Allstate's insureds, and if they obtain by assignment any claim the insureds might have against Allstate, perhaps then they may have an action against Allstate. But under the case law discussed above, they clearly have no standing to bring such an action now." *Scroggins*, 74 Ill. App. 3d at 1032.

Other Illinois cases have echoed *Scroggins*. See *Lewis v. Royal Globe Insurance Co.*, 170 Ill. App. 3d 516, 520, 524 N.E.2d 1126 (1988) (quoting *Richardson v. Economy Fire & Casualty Co.*, 109 Ill. 2d 41, 47, 485 N.E.2d 327 [1985]: well-established public policy in Illinois " 'prohibits an injured party from recovering personal injury damages against an insurance carrier on account of the negligence of its insured prior to obtaining a judgment against the insured' "); see also *Marchlik v. Coronet Insurance Co.*, 40 Ill. 2d 327, 332-34, 239 N.E.2d 799 (1968) (public policy precludes use of Illinois courts as forum for cases under Wisconsin direct action statutes which would permit suits against automobile liability insurers to be brought before insured's liability is established).

We do not intend to be the first and only court in the country to permit an insured to implead his or her insurer to litigate its negligence or bad faith in failing to settle while the underlying liability of the insured is unresolved. Despite all of the water under the bridge in this case since Judge Ballinger's error in September 2003, we cannot declare that error harmless. There is no way to know how or how much the presence of EMCASCO in the case

from September 2003 forward altered subsequent events. We therefore reverse the jury's verdict in favor of the Bryant and Nungesser parties and vacate the $2 million judgment and award of attorney fees. The agreements arising out of the mediation are null and void. With the exception of the issue discussed below, we must remand the case to the district court for further proceedings, starting from the place the parties would have been in if Judge Ballinger had granted EMCASCO's first motion to dismiss. This decision renders EMCASCO's arguments on the sufficiency of the evidence to support the jury's verdict and the merit and amount of the fees award moot. It also renders moot Bryant's motion for attorney fees, expenses, and costs related to the appeal to this court.

### Existence of a Presuit Settlement Agreement

Our decision on the previous issue does not moot EMCASCO's appellate argument that Judge Clark erred in granting partial summary judgment in favor of Nungesser on the existence of a presuit settlement agreement. Although Judge Clark's decision on this issue came long after Judge Ballinger's September 2003 ruling on EMCASCO's first motion to dismiss, it was controlled by unchangeable and uncontroverted facts that predated not only the motion to dismiss but also the entire case. In addition, we note that the issue of whether a binding settlement was effected presuit is one on which EMCASCO's and Bryant's interests are aligned. We therefore review the purely legal conclusion to be drawn from the undisputed facts, having had the benefit of full participation of all parties in the briefing and argument of this issue on appeal.

Judge Clark ruled: "As a matter of law, the communications between [Nungesser's attorney], on behalf of Plaintiff, and Bruce Fischer, on behalf of defendant Josh Bryant and/or EMCASCO, did not form a settlement contract." He set out several reasons for his conclusion, most significantly, that Bryant could not "establish a mutual agreement or a meeting of the minds."

Ample Kansas case law supports the hornbook proposition that an unconditional and positive acceptance is required to form a contract; a conditional acceptance of a settlement offer is but a counteroffer, which does not create a contract. *Steele v. Harrison,*

220 Kan. 422, 428, 552 P.2d 957 (1976) ("It is fundamental that a communicated offer creates a power to accept the offer that is made, and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract. Unless the original offeror subsequently expresses unconditional assent to the counter-offer there will never be a contract."); *Seymour v. Armstrong*, 62 Kan. 720, Syl. ¶ 2, 64 Pac. 612 (1901) ("If the acceptor affixes conditions to his acceptance not comprehended in the proposal, there can be no agreement without the assent of the proposer to such conditions); Restatement (Second) of Contracts § 59 (1979); 1 Corbin on Contracts § 3.28, pp. 457-63 Rev. ed. 1993 & 2006 Supp. In Judge Clark's view, Nungesser never unconditionally accepted EMCASCO's offer, and EMCASCO rejected Nungesser's counteroffer.

This court's standard of review on this issue is a familiar one:

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

When the evidence pertaining to the existence of a contract or the content of its terms is conflicting or permits more than one inference, a question of fact is presented. However, whether undisputed facts establish the existence and terms of a contract raises a question of law for the court's determination. See *Hays v. Underwood*, 196 Kan. 265, 267, 411 P.2d 717 (1966). There is no factual dispute among the parties on the events leading up to the filing of Nungesser's automobile negligence action against Bryant. Thus our appellate review of the district court's ruling on summary

judgment is unlimited. See *Roy v. Young*, 278 Kan. 244, 247, 93 P.3d 712 (2004).

EMCASCO suggests that "generally, a settlement agreement requires only an agreement concerning the amount to be paid to resolve the claim"; that an enforceable contract may exist despite the parties' agreement to resolve nonessential terms at a later time; and that immaterial or minor differences or variances between an offer and acceptance will not prevent the formation of a contract, citing *Giblin v. Giblin*, 253 Kan. 240, 854 P.2d 816 (1993); *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.*, 212 Kan 730, 737, 512 P.2d 379 (1973); *Connor v. Hammer*, 201 Kan. 22, 439 P.2d 116 (1968); *Lewis v. Gilbert*, 14 Kan. App. 2d 201, 785 P.2d 1367 (1990).

EMCASCO also notes that no formal exchanges of offer and acceptance are needed to create a legally binding settlement contract. An offer that does not specify any particular means of acceptance may be accepted in any reasonable manner. EMCASCO combines these correct statements of law with the argument that the October 9, 2003, note accompanying Carolyn Nungesser's $180 check to Wesley—which demanded the lien be released so that "we can conclude our settlement"—referred "to an existing agreement, not a pending offer than might be accepted if future conditions are met." Although it might be difficult to pinpoint the exact moment when a binding settlement agreement was reached, EMCASCO argues, the October 9 note made it clear that there was an agreement to settle by that time. In the alternative, it claims that Carolyn Nungesser's note itself constituted an acceptance of EMCASCO's offer to settle for the policy limit.

Both of these arguments were presented to and rejected by Judge Clark. Although the cases EMCASCO cites do stand for the general propositions of contract law they accompany, the cases do not support the assumption required to reach the outcome EMCASCO desires. Each case involves a situation in which unconditional acceptance of all essential terms was clearly communicated. *Giblin*, 253 Kan. 240; *Phillips & Easton Supply Co., Inc.*, 212 Kan 730; *Connor*, 201 Kan. 22; *Lewis*, 14 Kan. App. 2d 201. None holds that the point on which the parties continued to disagree here, *i.e.*,

the proper identity of the payee of the settlement proceeds, is a "nonessential" or "immaterial" term. In fact, disagreement between an offer and acceptance on that term is not a "minor variance." On the contrary, such disagreement can be fatal to formation of a contract. EMCASCO cites no precedent to the contrary, and we are aware of none.

Furthermore, as the district court noted, it is well established that, in order to create a contract, an acceptance must be unconditional and unequivocal. See *Steele*, 220 Kan. at 428; *Seymour*, 62 Kan. 720, Syl. ¶ 2; Restatement (Second) of Contracts § 59; 1 Corbin on Contracts § 3.28, pp. 457-62. The uncontroverted facts in this case demonstrate that Nungesser never accepted the exact terms of EMCASCO's offer, and EMCASCO refused before suit was filed to modify its offer to accommodate the conditions Nungesser required. Regardless of any language in Carolyn Nungesser's October 9 note, there was never a binding settlement agreement before or after that date. Moreover, she did not have authority to bind her husband, and delivery of her note to Wesley could not constitute a communication of acceptance to EMCASCO, the offeror.

Given the discussion above, we affirm Judge Clark's ruling in favor of Nungesser on the settlement agreement issue. No binding settlement was arrived at before Nungesser's suit against Bryant was filed.

Affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.

NUSS, J., not participating.

MARQUARDT, J., assigned.