(228 P.3d 429)

No. 101,812

WASTE CONNECTIONS OF KANSAS, INC., *Appellant*, v. RITCHIE CORPORATION, *Appellee*.

Opinion filed April 22, 2010.

*Steven D. Gough* and *Donald N. Peterson, II*, of Withers, Gough, Pike, Pfaff & Peterson, LLC, of Wichita, for the appellant.

*Ken M. Peterson* and *Will B. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for the appellee.

Before STANDRIDGE, P.J., PIERRON, J., and BUKATY, S.J.

PIERRON, J.: Waste Connections of Kansas, Inc. (WCK), appeals a summary judgment ruling in favor of Richie Corporation (Richie) concerning the amount of the purchase price owed when Waste Connections exercised its right of first refusal for the purchase of a waste transfer station.

As both parties requested summary judgment, the facts are for the most part established and uncontradicted. Rather, both parties interpret the facts in favor of their respective positions.

WCK is a Delaware corporation authorized to do business in Kansas. WCK is the successor in interest to BFI Waste Systems of North America, Inc. (BFI). Ritchie is a Kansas corporation based in Wichita. Ritchie is the owner of real estate in Sedgwick County that contains a landfill and also a waste transfer station. The first critical event in this case was the sale of the transfer station from Ritchie to BFI.

On December 29, 1998, Ritchie and BFI entered into a real estate contract for the sale of the 16.8 acres containing the transfer station. In conjunction with the real estate contract, the parties entered into an escrow agreement stating that BFI had the right to operate a nonhazardous solid waste transfer station for 35 years. As compensation for the sale, the escrow agreement provided that BFI would make quarterly payments to Ritchie of 35 cents per ton of nonhazardous solid waste processed at the transfer station. Additionally, Ritchie retained a reversionary interest in the transfer station by virtue of the fact that upon expiration of the escrow agreement, the escrow agent was required to record the deed back in Ritchie's name. The critical piece of the escrow agreement is the right of first refusal given to BFI. It provides in full:

"**Right of First Refusal.** At all times this escrow agreement is in effect Buyer shall have a right of first refusal with respect to Seller's interest in this escrow agreement, including without limitation Seller's reversionary interest in the Property, however designated, to the effect that upon receipt by Seller of any offer to purchase Seller's interest in this Agreement or the Property by a third party, Seller shall give written notice to Buyer of the fact and terms of such third party offer. Buyer shall have forty-five (45) days after its receipt of such notice to notify Seller in writing of its election to purchase such interest(s) on such financial terms (the 'Election Term'). In the event Buyer does not notify Seller of its election to purchase such interest(s), then Seller may sell such interest(s) on such identical terms

to such third party so long as such sale is consummated within ninety (90) days after such Election Term. If such sale to the third party is not consummated within such period, then the Buyer shall again have the right of first refusal to purchase such interest(s) prior to any sale to any third party. This right of first refusal shall specifically not apply to any transfer or assignment by Seller to an affiliate of Seller or to any stockholder of Seller or any of their affiliates."

The escrow agreement also provided for the payment of attorney fees to the prevailing party in case of a dispute over the agreement.

The escrow agreement was amended in 2001 to reflect an increase in the amount of the per-tonnage quarterly payment from 35 cents to 52 cents and to also install a rate increase of 7.5% every 5 years. In consideration for the rate increase, Ritchie agreed not to file a petition for annexation or consent to annexation by the city of Wichita with respect to the landfill property contiguous, in part, to the transfer station. Ritchie also agreed to use its best efforts to maintain use of the adjacent property separating the transfer station and the landfill as "Land Devoted to Agricultural Use."

The next critical event in this case occurred on June 22, 2007, when Ritchie entered into an asset purchase agreement with Cornejo & Sons, Inc. (Cornejo), for purchase of the landfill and also purchase of Ritchie's rights and obligations in the transfer station as outlined in the escrow agreement. In 2007, Cornejo approached Ritchie about purchasing the landfill. However, Ritchie wanted a package deal for sale of both the transfer station and the landfill at a cost of $5.5 million ($3.5 million for the landfill and $2 million for the transfer station). Cornejo countered that it was only interested in the landfill and would pay $3.5 million for the landfill. For the package deal, Cornejo counteroffered $4.95 million.

On the one hand, Ritchie independently estimated the value of the interest in the transfer station based on a discounted cash flow analysis was $2 million. On the other hand, Cornejo estimated the value of the interest in the transfer station was $1.45 million. Tom Ritchie testified in his deposition as follows:

"Q. Your company would have been willing to accept $1.45 million for the transfer station interest and $3.5 million for the landfill as a package deal with Cornejo; isn't that right?

. . . .

"A: That is correct but what we actually agreed to is fully contained in its entirety within the asset purchase agreement."

The parties agreed on a price for the package deal of $4.95 million. Cornejo testified that it did not care how the $4.95 million was allocated for the purchase as long as Cornejo could buy the landfill for $3.5 million. Tom Ritchie also testified that it was Ritchie's idea to allocate $2 million of the package deal to the transfer station. Ritchie and Cornejo came to an agreement as provided in the asset purchase agreement. The critical language in the asset purchase agreement with regard to WCK's right of first refusal in the escrow agreement was obviously the purchase price of the transfer station. Under the terms of the asset purchase agreement, the price was as follows:

"2.1 Purchase Price and Payment. The purchase price for the entirety of the Assets shall be Four Million Nine Hundred Fifty Thousand Dollars ($4,950,000), payable in cash or certified funds at Closing, of which Two Million Dollars ($2,000,000) will be allocated to and paid to Ritchie Corporation for the purchase of its rights and the assumption of its obligations under the Escrow Agreement.

"In the event that Waste Connections of Kansas, Inc. shall, upon receipt of due and proper notice from Sellers, elect to exercise its right of first refusal under the Escrow Agreement, the parties agree that the purchase price for the remaining Assets shall be Three Million Five Hundred Thousand Dollars ($3,500,000.00), payable in cash or certified funds at Closing."

By letter dated June 27, 2007, Ritchie notified WCK of Cornejo's offer to purchase the transfer station interest and attached a copy of the asset purchase agreement. The letter stated:

"Ritchie Corporation has received an offer to acquire its interest in the escrow agreement for $2,000,000.00 cash as specified in the attached Asset Purchase Agreement. Waste Connections of Kansas, Inc. holds a Right of First Refusal pursuant to Section 21(m) of the Escrow Agreement, and on behalf of my client, Ritchie Corporation, this correspondence shall serve as notice of the facts and terms of the referenced third-party offer."

On August 2, 2007, Robert Epstein, WCK's attorney, had a phone conversation with Terry Pilgreen, Ritchie's attorney, and advised him that WCK had a dispute over the value of the transfer station and that WCK thought the pricing on the transfer station

should be $1.45 million, not $2 million. Epstein followed up his phone conversation with Pilgreen with the following letter:

"The purpose of this letter is to advise you that Waste Connections of Kansas, Inc. has elected to exercise its option to purchase Ritchie Corporation's interest in the Wichita Transfer Station property pursuant to the provisions of the Escrow Agreement.

"Please advise your client that Waste Connections of Kansas has exercised its option to purchase. There are certain matters with respect to the contract which I believe we need to discuss in greater detail. Please contact me upon your receipt of this letter so that we may proceed to complete this purchase and sale. We would like to schedule a conference call to discuss certain matters relating to this transaction."

Additional correspondence and communications occurred between Ritchie and WCK, including some correspondence with Cornejo, concerning the right of first refusal and the appropriate price. By letter dated September 13, 2007, WCK again informed Ritchie that it disputed the price owed under the right of first refusal and that the appropriate price was $1.45 million, not $2 million. In conjunction with the September 13 letter, WCK delivered a certified check to the escrow agent in the amount of $2 million to "acquire all of Ritchie's interest in the escrow agreement and the assumption of Ritchie's obligations under the escrow agreement." The September 13 letter also stated:

"Waste Connections' delivery of this check is subject to its express reservation of its rights to determine the proper price payable for its exercise of the Right of First Refusal is $1,450,000.00, rather than $2,000,000.00 as claimed by Ritchie, which reservation includes all remedies that are available upon such a determination."

On September 28, 2007, the parties held a closing for the escrow agreement where Ritchie's rights and interest in the transfer station were transferred to WCK in exchange for the payment of $2 million. Two documents were executed at the closing entitled "Right of First Refusal Exercise and Release of Escrow" and "Reservation of Rights," both documents reserving the respective parties' rights, and in WCK's case, the right to seek a determination that WCK was actually required to only pay $1.45 million to exercise its right

of first refusal. On December 27, 2007, Cornejo closed on its purchase of the landfill and paid Ritchie $3.5 million.

On September 13, 2007, WCK filed its petition for declaratory judgment against Ritchie seeking determination of the proper price owed under its right of first refusal and for breach of the duty of good faith and fair dealing. The parties submitted competing motions for summary judgment. The district court granted summary judgment in favor of Ritchie. The judge found as follows:

"This case, I think turns on the fact that there was a contract that would allow the plaintiff to step into the shoes of a third party purchaser to buy a piece of property that was owned by the defendant. For purposes of this, I note specifically that from the git-go the defendant was going to require Cornejo in this case to buy the landfill as a package deal and wanted to allocate 3.5 million for the landfill and 2 million for the transfer station. As I looked through the facts, I find nothing to suggest that Ritchie in any way tried to manipulate with Cornejo the price they were seeking for the transfer station, nor did they waiver in dealing with Cornejo in making a contract with Cornejo any deviation from that desire to obtain 2 million dollars for the transfer station property. I think the seller has the right to establish value for their property absent some kind of bad faith or collusion, which I find no evidence that suggests in this case that there was bad faith or collusion on the part of Ritchie in arriving at a contract, which it did in this case, which established a 2 million dollar value for the landfill. The acceptance of that offer by Cornejo established the contract and established then and triggered the right of first refusal in the escrow agreement which the plaintiff has exercised and now wishes the court in my own opinion to reform the original contract to a matter of something more acceptable to them.

"Package deals I think have to be looked at very carefully. When one - - when there's two pieces of property and one has the right of first refusal and one does not, to protect someone like Waste Management in this case from a collusive effort or bad faith dealing on the part of one to arbitrarily or capriciously set a price too high. To extort or get from a person a value that they would not otherwise have to pay if there was a willing buyer and a willing seller. The willing seller I think has to have the right to say I'm not selling this piece of property other than for this price, and clearly the evidence establishes that that was the price that they set out and there has been no evidence that I can find that would suggest that there was bad faith or unfair dealing with the, by the parties in this case to establish that price.

"Based upon those findings and the court's conclusions as to contract law, the parties being entitled to the benefit of their bargain, and that bargain was that in a sense there has to be a willing sale, and that is accomplished in this case through the sale to Cornejo with the landfill set at the price of 2 million. The summary judgment is proper in this case for the defendant and as to the price of the land

of 2 million dollars, and the court will grant summary judgment on that basis, and I would ask the defendant to draw a journal entry with respect to that matter."

The district court also granted attorney fees and costs to Ritchie in the amount of $108,972.15.

WCK challenges the district court's summary judgment ruling in favor of Ritchie. WCK contends Ritchie breached the terms of the right of first refusal and that WCK is entitled to purchase the transfer station for $1.45 million.

We need not recount the standards for the district court's consideration of a motion for summary judgment. They are well known to the parties and can be found in *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 555, 205 P.3d 1245 (2009), and *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009). On appeal, we stand in the shoes of the district court and examine the parties' summary judgment motions de novo using the same standards that apply to the district court's consideration of such matters. See *Roe v. Kansas Dept. of SRS*, 278 Kan. 584, 591, 102 P.3d 396 (2004).

First, WCK argues Ritchie breached the escrow agreement by failing to communicate the fact and terms of the actual offer made by Cornejo that was acceptable to Ritchie. We disagree.

The escrow agreement states in relevant part that "upon receipt by Seller of any offer to purchase the Seller's interest in this Agreement or the Property by a third party, Seller shall give written notice to Buyer of the fact and terms of such third party offer." WCK bases its argument on the language "any offer" and that as soon as Ritchie and Cornejo agreed on the purchase price of $1.45 million for the transfer station, Ritchie was contractually required to present that offer to WCK under the right of first refusal. See *Bergman v. Commerce Trust Co.*, 35 Kan. App. 2d 301, 306-08, 129 P.3d 624 (2006) (As soon as defendant received an offer from a third party that defendant was willing to accept, plaintiff's right of first refusal ripened into a present enforceable contract right to purchase based on the terms offered by the third party.).

WCK argues that because Cornejo's actual offer was acceptable to Ritchie, WCK's right of first refusal ripened into a right to buy

the transfer station under the terms of Cornejo's actual offer for $1.45 million. WCK argues it is entitled under the escrow agreement to step into Cornejo's shoes with respect to Cornejo's actual offer and WCK acquired the right to require Ritchie to sell both the landfill and the transfer station for no more than $4.95 million. WCK also argues that Cornejo's actual payment to Ritchie of $3.5 million for the landfill established the price on the transfer station.

To the contrary, Ritchie argues that it never decided to accept any of Cornejo's overtures during negotiations and instead insisted upon receiving the price of $2 million for the transfer station. Ritchie contends that regardless of any evidence that Cornejo only offered $1.45 million for the transfer station, Ritchie did not accept or form any specific intent to accept any offer to sell the transfer station for $1.45 million. Ritchie states the only offer that it accepted was $2 million as outlined in the asset purchase agreement.

When construing the right of first refusal provisions contained in an agreement, we exercise a de novo standard of review. See *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 920, 46 P.3d 1120 (2002). When construing the escrow agreement, we bear in mind the following rules:

> "An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]" *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000).

WCK's right of first refusal was not enforceable against any offering presented to Ritchie. There must be a meeting of the minds and an agreement to constitute a bona fide offer. In reading the escrow agreement, we acknowledge the language "any offer" is utilized. However, this language must be read in context with the very next sentence that WCK had 45 days "to notify Seller in writing of its election to purchase such interest(s) on such financial terms (the 'Election Term')." As was the case in *Bergman*, 35 Kan. App. 2d at 307, the third-party offer is one that the seller is willing to accept. It is unrealistic that WCK could step in at any outrageous

offer and require Ritchie to sell at that amount. Therein lies the difference between an option and a right of first refusal.

A right of first refusal creates an enforceable right to purchase when an owner decides to sell. Compare *Weintz v. Bumgarner*, 150 Mont. 306, Syl. ¶¶ 2-3, 434 P.2d 712 (1967) (an option empowers the possessor of the right to compel an unwilling owner to sell). A right of first refusal requires the owner, when and if the owner decides to sell, to offer the property first to the person entitled to the preemptive right at the stipulated price. *Bergman*, 35 Kan. App. 2d at 306. The court in *Anderson v. Armour & Company*, 205 Kan. 801, 805, 473 P.2d 84 (1970), stated: " 'Under a lease giving tenant a pre-emptive right of purchase, at such time as the owner forms a specific intention to sell such right ripens into a present enforceable contract right of the tenant to purchase.' "

Kansas law requires the combination of two events for the right of first refusal to ripen into an enforceable contract right: (1) the receipt by the seller of a bona fide offer and (2) the decision by the seller to accept that specific offer on its terms. *Bergman*, 35 Kan. App. 2d at 307-08. The triggering event in this case was the creation of the asset purchase agreement between Ritchie and Cornejo of the package deal of the transfer station and the landfill. There is no evidence or suggestion that Ritchie did not give proper notice of the offer in the asset purchase agreement.

Ritchie also argues WCK's acceptance and execution of the right of first refusal by paying Ritchie $2 million negated the opportunity to challenge the purchase price and, in effect, to alter the asset purchase agreement. We disagree based on documents executed by Ritchie in conjunction with WCK's execution of the right of first refusal.

Ritchie contends WCK had the option to either accept the purchase price or reject the offer and that when WCK accepted and exercised the right of first refusal a binding contract formed to sell the transfer station for $2 million. Ritchie argues that acceptance may only be made upon the specific terms of the seller, and contract law knows of no concept as a "conditional acceptance," citing *Nungesser v. Bryant*, 283 Kan. 550, 565-66, 153 P.3d 1277 (2007). However, as cited in *Nungesser*, 283 Kan. at 566, the court in

*Seymour v. Armstrong*, 62 Kan. 720, Syl. ¶ 2, 64 P. 612 (1901), stated: "If the acceptor affixes conditions to his acceptance not comprehended in the proposal, there can be no agreement without the assent of the proposer to such conditions."

Ritchie argues that WCK's notion that it had the option to accept the offer but then force terms other than those it explicitly accepted is a legal falsehood and is not recognized under contract law. Ritchie contends that it was incumbent upon WCK to negotiate a different price or take necessary legal measures, such as injunctive relief, prior to accepting Ritchie's offer if it believed it was entitled to a different price. Ritchie also contends that because WCK executed the right of first refusal, WCK should be precluded or estopped from pursuing a breach of contract remedy.

WCK responds that its conditional execution of the right of first refusal is not a reformation of the asset purchase agreement. Rather, WCK asks the court to interpret the asset purchase agreement to give effect to WCK's right of first refusal in the escrow agreement. WCK argues its position gives effect to, and is consistent with, both the terms of the escrow agreement and the asset purchase agreement since WCK would receive the value a third party was willing to pay and Ritchie was willing to accept for the transfer station.

WCK argues it has long been the law in Kansas that payment of a disputed amount, pursuant to a contract that provides that a party may obtain a refund if a court determines the proper price was lower, fully preserves that party's right to obtain a refund by having a court determine the proper price. WCK cites *Waechter v. Amoco Production Co.*, 217 Kan. 489, 515-16, 537 P.2d 228 (1975), where the court stated, in the context of oil and gas royalty payments, that where excess payments have been made in good faith, the payor may recover the payments to which the payee was not entitled. In *Juneau v. Stunkle*, 40 Kan. 756, Syl. ¶ 2, 20 P. 473 (1889), the court held that where a payment on a bill for lumber was made with the understanding that if an overpayment was found at the final settlement, the excess would be repaid.

It is undisputed that WCK executed its right of first refusal for $2 million dollars. It is also undisputed that for its first notice, WCK

challenged the value placed on the right of first refusal under the asset purchase agreement executed by Ritchie and Cornejo. In acceptance of WCK's payment on the right of first refusal, Ritchie executed several documents reserving a determination of the appropriate price. By signing the Right of First Refusal Exercise and Release of Escrow, Ritchie agreed:

"On September 13, 2007 Waste [Connections] delivered a certified check to the Escrow Agent in the amount of $2,000,000.00, payable to Ritchie, with a reservation of Waste [Connections'] right to seek a determination that Waste [Connections] is actually required to pay only $1,450,000.00 under Paragraph 21(m) of the Escrow Agreement when applied to the Purchase Agreement to exercise its Right of First Refusal, which reservation includes all remedies available in the event such a determination is made."

The reservation of rights document, also signed by Ritchie, provided that WCK's rights to challenge the appropriate price for the right of first refusal survived the closing of the escrow agreement.

Here, WCK essentially executed the right of first refusal in protest. WCK executed the right in order to protect its ability to purchase the property. WCK's position from the very start has been that the appropriate offer under the asset purchase agreement was $1.45 million. Ritchie recognized WCK's challenge to the purchase price and executed documents at closing recognizing WCK's challenge, as was appropriate.

Next, WCK argues the asset purchase agreement shows that $1.45 million was the price that Cornejo was willing to pay for the transfer station because Cornejo offered to pay $4.95 million for both properties and $3.5 million for the landfill as a stand-alone purchase.

Several legal maxims of contract interpretation are relevant for our discussion. An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. See *City of Arkansas City v. Bruton*, 284 Kan. 815, 832-33, 166 P.3d 992 (2007). The law favors reasonable interpretations and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. See *Wichita*

*Clinic v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946, *rev. denied* 287 Kan. 769 (2008).

WCK argues interpreting the asset purchase agreement to require a $2 million dollar price tag for the transfer station is inconsistent with the entirety of the purchase if the stand alone purchase of the landfill is $3.5 million. On the other hand, Ritchie argues the asset purchase agreement is crystal clear that the price of the transfer station is $2 million. Ritchie also argues it should be able to "maximize the amount it will receive in payment for its property and should not be prohibited from receiving more in separate sales than it would under a package deal."

Ritchie argues it is not required to forego its business judgment and give priority to another party's interests as a result of the duty of good faith and fair dealing, but only not to intentionally injure, impair, or impede the contractual rights of the other party. Otherwise, Ritchie claims such a rule would open up the independent judgment and prudent decisions of businesses in this state to unwarranted second guessing by courts under the auspices of bad faith and unfair dealing claims.

Over the years, certain basic concepts of law have become firmly established when a contract is alleged to be ambiguous. Parties to a contract should be bound by the strict terminology of that contract unless such terminology is ambiguous or unless there was a mistake involved. *Schlatter v. Ibarra*, 218 Kan. 67, 74-75, 542 P.2d 710 (1975). Determining whether a written contract is free from ambiguity is a judicial function. *Hird v. Williams*, 224 Kan. 14, 16, 577 P.2d 1173 (1978). The language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense that the contract may be understood to reach two or more possible meanings. *Duffin v. Patrick*, 212 Kan. 772, Syl. ¶ 4, 512 P.2d 442 (1973). Once the court decides this question of law and determines the contract to be unambiguous, the intention of the parties and the meaning of such a contract are to be deduced from the plain, general, and common meaning of those terms. *Duffin*, 212 Kan. at 778.

Although on the surface the asset purchase agreement is seemingly clear on the purchase price of the transfer station, the price

fluctuates based on whether WCK executes the right of first refusal. Consequently, the price is ambiguous.

"2.1 Purchase Price and Payment. The purchase price for the entirety of the Assets shall be Four Million Nine Hundred Fifty Thousand Dollars ($4,950,000), payable in cash or certified funds at Closing, of which Two Million Dollars ($2,000,000) will be allocated to and paid to Ritchie Corporation for the purchase of its rights and the assumption of its obligations under the Escrow Agreement.

"In the event that Waste Connections of Kansas, Inc. shall, upon receipt of due and proper notice from Sellers, elect to exercise its right of first refusal under the Escrow Agreement, the parties agree that the purchase price for the remaining Assets shall be Three Million Five Hundred Thousand Dollars ($3,500,000.00), payable in cash or certified funds at Closing."

Ritchie states that it has the evidence to support that the transfer station was worth $2 million based on an independent evaluation of the value of interest over time based on a discounted cash flow analysis. Cornejo's valuation of the transfer station was $1.45 million.

The package deal is a risky situation in the terms of the right of first refusal. There is "a risk in package deals that the purchase price may be unfairly allocated or padded to defeat the rights of first refusal." *In re Adelphia Communications Corp.*, 368 B.R. 348, 353 (Bankr. S.D.N.Y. 2007). In a package deal situation, more protection needs to be given to the right of first refusal to prevent collusion or bad faith. In a package deal, the purchase price should come under greater scrutiny and any doubt in the amount should be resolved to protect the right of first refusal.

In the context of a package deal, we do not agree with Ritchie's "maximized profits" argument. Ritchie cannot maximize its profits solely at the expense of WCK and the right of first refusal. WCK argues this would evade the "spirit of the bargain" in the escrow agreement. We agree. Ritchie acted in bad faith by attempting to maximize its profits to "recapture opportunities foregone" through granting of the right of first refusal. See Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 372 (1980). The duty of good faith and fair dealing applies to Ritchie's acts that impacted the escrow agreement. Ritchie cannot maximize its profits at the expense of WCK's right of

first refusal where WCK was not even at the bargaining table for the asset purchase agreement.

The district court concentrated on Ritchie's ability to sell the property for what Ritchie thinks it is worth. Ritchie, of course, has a right to establish a price its property. However, there is no guarantee a willing buyer will offer to buy the property at Ritchie's price. What a person thinks his or her property is worth is not the market value of the property. What a buyer is willing to pay for the property is the market value of the property. Just because Ritchie wants to get $2 million for the transfer station does not mean that Ritchie will be able to sell the transfer station for $2 million. Just as Ritchie has its opinion, we find that Cornejo had the opinion that the value of the transfer station was $1.45 million.

We believe Ritchie mischaracterizes Cornejo's decision to enter the contract. The only thing Cornejo agreed to was a package purchase price of $4.95 million. The evidence states that Cornejo did not care how Ritchie proportioned out the total purchase price as long as it did not pay more than $3.5 for the landfill. C.D. Royce, the chief financial officer from Cornejo, testified in his deposition, "What we said is we want - - if we're going to buy them both, we'll buy them both for $4,950,000 is the number I remember. If we're only going to buy one, we want the landfill. We'll pay 3.5 million." Royce was asked the following question, "Did it make any difference how that price was allocated from the 4.95 million total to Cornejo as how much would be landfill, how much would be transfer station?" Royce answered, "No. The allocation, no. We didn't care." In his deposition, Tom Ritchie was questioned, "Your company would have been willing to accept 1.45 million for the transfer station interest and 3.5 million for the landfill in a package deal with Cornejo; isn't that right?" Ritchie answered, "That is correct."

The district court stated that protection is necessary in a package deal situation to prevent a seller from "extort[ing] or get from a person a value that they would not otherwise have to pay if there was a willing buyer and a willing seller." On the other hand, the court had no problem with a package deal that was more lucrative to the seller if the right of first refusal was executed.

In the context of a package deal involving a right of first refusal, the price for the total package generally should not fluctuate based upon whether the right of first refusal is executed. Ritchie should not be able to receive more money after exercise of the right of first refusal. For the right of first refusal to be given its lawful effect, Ritchie should be in the same financial position regardless of whether WCK exercises the first refusal. That is not the case here. WCK cites *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 228 (7th Cir. 1996), where the court discussed that sellers are financially indifferent to the exercise of the right of first refusal because of the requirement of identical price, but they may have preferences driven by other interests.

In *Pantry Pride Enterprises v. Stop and Shop Companies*, 806 F.2d 1227 (4th Cir. 1986), the court considered an offer by a third party for a package deal and the right of first refusal for a leasehold interest and equipment located on the property that was not subject to the right. The Fourth Circuit Court of Appeals held that where a sum was a mere tax allocation, allowing the plaintiffs to exercise the right of first refusal at that price would give them a windfall because the tax allocation may bear no relation to the property's worth. The Fourth Circuit reasoned that allowing the purchase at the tax allocation price would be to create a value for the product over and above the bargain struck by the parties. 806 F.2d at 1231. "Put another way, [defendant] will have acquired a supermarket at an absurdly low price and on terms never really agreed to between [the seller and buyer]." 806 F.2d at 1231. To resolve the damages issue, the Fourth Circuit ordered the parties to submit to the district court, on remand, evidence of the value of the property at the time of the offer. 806 F.2d at 1232.

Kansas courts imply a duty of good faith and fair dealing in every contract. Parties shall not intentionally and purposely do anything to prevent the other party from carrying out his or her part of the agreement or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Daniels v. Army National Bank*, 249 Kan. 654, 658, 822 P.2d 39 (1991) (quoting *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 [1987]) (both quoted with approval in *Kansas*

*Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 725, 864 P.2d 204 [1993]); see 17A Am. Jur. 2d, Contracts § 370. Because there are a multitude of ways that a sale can circumvent a grantee's right of first refusal in a package deal, the duty of good faith and fair dealing should be applied prominently in cases like the one before us.

The bottom line is that Ritchie chose a package deal to sell its interest in the transfer station. Ritchie did not act in good faith in setting the total price of the package deal at $4.95 million and allocating $2 million to the transfer station but including a provision that Cornejo could purchase the landfill as a stand-alone purchase for $3.5 million. If the total package deal is worth $4.95 million and the transfer station is allocated $2 million, then the allocated value of the landfill in this scenario is $2.95 million. The value $2.95 million is directly contrary to the $3.5 million for the landfill set forth in the asset purchase agreement if WCK exercised the right of first refusal.

It is clear that Cornejo wanted to purchase the landfill for $3.5 million. It is also very clear that Ritchie wanted to sell its rights to the transfer station for $2 million. In the package deal, Cornejo was unwilling to purchase both the transfer station and the landfill for $5.5 million. Through negotiations, the parties agreed on a purchase price of $4.95 million for the package deal. Ritchie would argue that Cornejo accepted a $550,000 lower price for the landfill. In the context of a package deal, we find that WCK, as possessor of the right of first refusal, is denied the benefit of the deal if it is not entitled to the reduced price for the transfer station.

We, therefore, reverse and grant judgment to WCK in the amount of $550,000 on the issue of the actual sale price. We also remand to the district court for a reconsideration of the attorney fees issue.

Reversed and remanded with directions.